## Sellers v. Sellers, etc.

(Decided December 18, 1914.)

### Appeal from Harrison Circuit Court.

1. Deeds.—The courts make a distinction between testamentary deeds and a deed which is the result of an ordinary business transaction, and where the parties are dealing with each other as business antagonists.

2. Verdict—When Court May Disregard.—Where in an equitable action the court submits the issues to a jury merely for their advisory aid, their verdict is not necessarily conclusive, and the court may disregard it.

W. S. CASON and CASON & COX for appellants.

M. C. SWINFORD for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Reversing.

This is a controversy between a widow and her stepchildren. Eleven Sellers owned a farm and a small home in a little town. During his last illness he conveyed the home to his wife in fee. This is a suit in equity by the children to set aside that deed on the grounds of undue influence and mental incapacity. The farm is not involved. The court submitted the issues of fact to a

jury, and nine of them signed a verdict against the deed. The court rendered a judgment thereon, holding the deed invalid. The widow appeals.

Eleven Sellers was married to the appellant in 1899. He was 64 years old, and she was 49. It was his second marriage and her first. He had three children by his first wife, and they are the appellees. There was no issue of the second marriage. At the time of the second marriage his three children had married and were raising families of their own. Mr. Sellers lived thirteen years after this marriage, and died at the age of 77. At the time of the marriage he owned a farm of 117 acres, four or five miles from the town of Berry, in Harrison county. About a year after the marriage he became afflicted with weeping eczema, a foul and loathsome disease. The physician says it covered his whole body and was the worst case he ever saw. For years he suffered from this, and required the services of a physician. Mrs. Sellers had to bathe him and wash and change his clothing and bed linen every day. Besides this she cooked and did all the washing and housekeeping. During a part of the first year she had for help a little ten-year-old girl, but from that time until her husband's death she did all the work.

After living on the farm seven years they moved to Berry; that is, in 1906. Mr. Sellers bought a little house there for $600, and they lived in it until his death. The proof shows that he went back and forth to his farm every day or so, as the weather would permit, but along in January before his death in March, 1912, he sold about 10 acres off of his farm. No one doubts that at this time he was mentally capable of protecting himself in a business transaction. His children were displeased when they heard that he had sold part of the farm, and, as they say, they heard he was about to sell the remainder. So, by agreement among themselves, they met at Berry in the latter part of January, 1912, and went in a body to the home of their father and "Mrs. Sellers," as they speak of her. They told him, in Mrs. Sellers' presence, that they did not want the farm sold and asked him to transfer or turn it over to them for division, and they would give him a contract to pay him $15 per month for his support. He was surprised and his feelings hurt, and in tears told them that it was his property and he felt capable of managing his own affairs. After this he talked with several of his neighbors, told

them the facts of his children's visit and his disappointment, and fear that they would try to deprive his widow of a home when he died. He told them he wanted to secure to Mrs. Sellers the home in Berry, and inquired of them about the efficacy of wills and deeds, and said he was afraid of wills, because they were sometimes broken. On March 29th, he was taken down with acute bladder trouble. Dr. Lang, who for years had been treating him for eczema, was called in. This doctor was also a notary public. On April 6th, Mr. Sellers had the doctor prepare a deed, and by which he conveyed to his wife the little town home. The doctor says that up to and including this time Mr. Sellers possessed all his mental faculties, and understood what he was doing and the effect of the deed.

Dr. Lang testifies that Mr. Sellers told him what he wanted done and why he wanted to do it. In fact, Mr. Sellers had advised with him two months before and said that as soon as he could get time he wanted the doctor to fix up some papers for him, and, in that connection, told him of the visit of his children, and their desire to have him divide his farm between them. He gave to the doctor the same reason for having the deed written that he had expressed to his neighbors—the fear that his children would not deal fairly with his widow. He also made mention of the burden he had been, and of Mrs. Sellers' faithfulness in caring for him during all of his afflictions, and that it would be doing too little for her to give her the town home.

As soon as Mr. Sellers was taken sick his children began to visit him, and, as they say, aided in caring for him and administered medicine. They testify to giving him tablets prior to April 6th, which acted like opiates, and say that at no time after he was taken sick and these medicines were administered to him was he mentally capable of understanding a business transaction. The trial proceeded on the idea that the deed was of a testamentary character, and the same wide range was permitted in the introduction of testimony, but the instructions to the jury were based rather upon the idea that the instrument in question was an ordinary deed, executed under circumstances when the parties are supposed to be dealing at arms' length, and required the jury to believe that Mr. Sellers not merely knew the objects of his bounty and the nature of his property, but also *his property rights*. Naturally the jury must have

concluded that it requires a higher degree of mental soundness to know one's property rights than it does to know what property one has. Under these instructions the jury found against Mrs. Sellers and set the deed aside.

The courts make a distinction between testamentary deeds and a deed which is the result of an ordinary business transaction, and where the parties are dealing with each other as business antagonists. Meuth's Exrx v. Meuth, 157 Ky., 784; Best, &c. v. House, 113 S. W. Rep., 849; Brammel v. Brammel, 101 Ky., 75; American & Eng. Enc. of Law, Vol. 28, page 74.

Aside from his age and sickness, three circumstances are relied on by the children to show that Mrs. Sellers unduly influenced him to make the deed.

1. She carried the purse—during his last illness they proved by two or three witnesses that they went to his home to make collections. Mr. Sellers would examine the accounts and hand them to his wife for approval and request her to pay them. She went to the purse, procured the money and paid them as directed.

2. In January, when the children wanted him to divide the farm between them, and offered him $15 per month, they say he made no objection at first, but that when he called his wife and talked to her about it in their presence—they could not hear the conversation—he turned to them with the remark that it was his property; he was not dead yet; and he was capable and desirous of managing his own affairs.

3. Dr. Lang says that, when requested to prepare the deed, he found in the sick room a printed blank form of deed on the table with pen and ink—everything ready to write it. The argument is that Mr. Sellers had been confined to his room for a week and could not have procured the blank form, and, therefore, his wife was responsible for it being there. Some facts are presented on the motion for a new trial tending to show that Dr. Lang, on reflection, was convinced that his testimony in this respect was erroneous. But, disregarding these facts, and accepting the case as it went to the jury, we do not believe the presence of the blank form, and the fact that he had been sick for a week, is proof either that Mr. Sellers did not, or that she did, make the preparation. If he advised with friends about making the deed more than two months before and spoke to the doctor about writing it, when his sanity is certain, and expressed

a desire to convey by deed rather than devise by will, is it unreasonable that he took steps to perfect the plan and himself procured the blank form before he got sick?

Except the testimony of his children and their children, all the evidence tending to show mental incapacity during his last illness relates to times after the deed was made, and when it is admitted that he was frequently under the influence of opiates. From Dr. Lang's testimony, we gather that, prior to April 6th, opiates were administered to him only on occasions of extreme pain, and the effect was temporary, so that when the pain was relieved and he would come from under the influence of the opiates, he was bright and had a good understanding of everything. It was not until after April 6th that opiates were regularly administered, and even then he possessed his mental faculties when not under their immediate influence. From his testimony there can be no question as to his mental soundness at the time he made the deed. He was introduced as a witness by the children, and his disinterestedness is conceded by all parties.

For the purpose of showing mental incapacity, two instances are shown before his illness. One witness, Sandy Simpson, about 55 years of age, says that he met Mr. Sellers on the road during the previous summer, and that Mr. Sellers called him "Uncle Sandy." While the witness displays no resentment over this, he does say it never occurred before. Other witnesses, even younger, in giving their testimony, repeat conversations they had with Mr. Sellers, and it appears that he spoke to them as "uncle" or "aunt." The fact that these witnesses were not astonished by this familiar form of address indicates that they accepted it as a sign of close intimacy. The other instance is about a witness writing a rent contract for Mr. Sellers when the witness knew that Mr. Sellers had already contracted the land to another party. But the other party testifies that he had surrendered that portion of the land and consented to the making of another contract.

We have reached the conclusion that the weight of the evidence is against the verdict. We are unable to see that his conveyance of the town home to his wife was the result of any influence other than that produced by the children themselves, when they requested him to let them administer on his estate. Through all their married life Mrs. Sellers was kind and attentive. There is no conflict in the evidence as to his affection for her, and

the great service she rendered him. That he appreciated it, his neighbors testify, and, from their testimony, it is clear that the conveyance was not only rational and commendable, but the result of a determination formed months before his last illness.

We would be disposed to give more effect to the verdict were it not for the error in the instructions above referred to. But this being purely an equitable action, the court, out of its discretion, and not under any requirement of law, submitted the issue of fact in order to obtain advisory aid of the jury. Their verdict is not necessarily conclusive and the chancellor may disregard it. Hill v. Phillips, 87 Ky., 169; McIlwain v. Russell, 11 Ky. L. R., 649; Ford v. Ellis, 21 Ky. L. R., 1837; Morawick v. Martineck, 128 Ky., 155; Bannon v. Patrick-Bannon Sewer Pipe Co., 136 Ky., 556.

· · Feeling that the weight of the evidence favors the validity of the deed, we are of the opinion that the lower court should have disregarded the verdict, and the judgment is reversed with directions to enter a decree upholding the deed.