## Collier, et al. v. Dundon, et al.

(Decided April 27, 1915.)

### Appeal from Nicholas Circuit Court.

Deeds—Cancellation—Mental Incapacity—Undue Influence—Evidence.—In an action to set aside a deed on the ground of mental incapacity and undue influence, evidence examined and held to sustain the finding of the chancellor denying the relief prayed for.

WM. CONLEY and JOHN P. McCARTNEY for appellants.

DENNIS DUNDON, HOLMES & ROSS and SWINFORD & SWINFORD for appellees.

Opinion of the Court by William Rogers Clay,
Commissioner—Affirming.

On November 30th, 1910, John Turley, a resident of
Nicholas County, conveyed to John Turley Dundon and
James Miller Dundon, infant sons of Elizabeth Dundon,
a tract of land located in Nicholas County, of the value
of $10,000.00 or $12,000.00, and containing about 150
acres. In September, 1911, John Turley died the owner
of considerable estate. His wife died several years
before. They left no direct descendants.

In December, 1911, this action was brought by Eliza-
beth Collier and others, collateral kindred of John Tur-
ley, to set aside the deed to the Dundon children on the
ground of mental incapacity and undue influence. The
undue influence is claimed to have been exercised by
Elizabeth Dundon, the mother of the infant defendants.
On final hearing, the chancellor denied plaintiffs the
relief asked, and they appeal.

Elizabeth Dundon was born in the year 1876. She
was a niece of John Turley's wife. When Elizabeth was
four years of age her father died. While on his death-
bed he gave Elizabeth to Mrs. Turley to raise. Mr. and
Mrs. Turley were very kind to Elizabeth and treated her
as. if she were their own child. She was away at school
for several years and during the summer would return
to. their home. They gave her a liberal education and
seemed anxious to provide for her wants in every way.
While living with Mr. and Mrs. Turley she married
James Dundon. Of this union four children were born.
Shortly thereafter James Dundon died. At that time
Elizabeth and her children lived in Cynthiana. By the
death of her husband she was left without means for
the support of herself and the four little children. She
first obtained employment in a mercantile establish-
ment at Cynthiana. Her little girl and the baby boy
were taken by some of her relatives to rear. The two
older children, John Turley Dundon, the namesake of
John Turley, and James Miller Dundon, were taken by
Mr. and Mrs. Turley and their wants looked after in
every possible way. Several years prior to his death
Mr. Turley was interested in a merchandise establish-
ment at Headquarters. He was also the owner of about
400 acres of land, a stock trader and a large dealer in
tobacco. All the witnesses agree that Mr. Turley was

very fond of the two children. They frequently accompanied him on his trips about the farm and throughout the neighborhood. He would generally ride horseback and one of the children would ride in front of him and the other behind. For a number of years Elizabeth Dundon, the mother of the children, taught school in Bourbon County and at other places. During this time Mr. Turley bought a great many articles for her and sent her considerable money in small sums.

On November 30th, 1910, Mr. Turley went alone to the office of his attorney, I. B. Ross, and told him of his desire to make a deed to the two children. At the same time he told his attorney that he did not want the deed placed on record during his lifetime. Mr. Ross was unable to find the description of the land in the clerk's office, and Mr. Turley went to the clerk's office, and, through the latter's assistance, the description was found. After the deed was drawn Mr. Turley acknowledged it and delivered it into the hands of a former business associate, with directions to turn it over to the proper parties at the proper time. After Mr. Turley's death the deed was delivered to the guardian of the children. When the deed was made Mr. Turley was about eighty-six years of age.

The record is very voluminous and we deem it unnecessary to set out at length the testimony of the various witnesses. Several witnesses, including some of the plaintiffs and others, testified that Mr. Turley's mind was not as strong during the latter years of his life as it had been. They based their opinions on the fact that he slept a great deal and was very quiet and reticent. When asked if he was capable of making the deed in question, none of the witnesses, with possibly two or three exceptions, gave a very decided opinion on the subject. Even those who did give an opinion failed to support their opinion by any facts of a convincing character. It is true that one witness boasted of having set out to get the better of Mr. Turley in a trade and of his success in his efforts. This evidence, however, is not very satisfactory, for it tends to show a case of misplaced confidence and of successful trickery, rather than a case of mental incapacity. On the question of undue influence there is evidence to the effect that Mrs. Dundon stated that she could get her uncle to do anything she wanted. On one occasion she wrote him

a letter asking him to make some provision for his wife, but it does not appear that any success attended this effort. It further appears that she asked a certain physician to intercede in her behalf for the purpose of having her uncle make some provision for her. The following letter was found among Mr. Turley's papers:

"Dear Uncle John:

"I am wondering what you think we are living on. We have been here a month and you have sent me no change for anything and Mrs. Hutchcraft is getting worried about her rent. She was here three times for the rent in September and here again last night. I have always paid the rent during the first five days of the month. Now you ought to know that I can't pay grocery bills, coal bills, meat bills or any other kind of bills, without money. If you didn't want to do this you should have said so during the summer, so that I could have put the children in on orphanage. You should send me a check every month and not have me worrying about this thing. I can't work and see after the children both. I never have felt as down-hearted in my life as I do now, and a woman with a house full of children can't do on nothing. I am sending you a list of things for the children. Get them at the store and have Sam send them to me. You will have to send me something to meet my expenses of September and to run me this month. Coal is $3.75 a load. The boys wanted to go home last Saturday, but you sent them no word. Let me hear from you as soon as possible. Lovingly,

"ELIZABETH."

Mrs. Dundon explains this letter by saying that she had had a good offer in Oklahoma to come out there and teach school. She was not very well at the time, and her uncle told her that if she would get a house in Paris and rest for a year he would take care of her and the children. He had overlooked sending her any money and providing her with supplies. She was being importuned for the rent. This worried her very much and she wrote the letter for the purpose of having him comply with his promise. Dick Turley, who lived with John Turley and assisted him in transacting his business, says that Mrs. Turley had bought some lots in Oklahoma. After Mrs. Turley's death, John Turley had a deed drawn up conveying his interest in the lots to Mrs. Tur-

ley's sister. The witness states that he talked to Mrs. Dundon about it, and she said that she would rather see every cent of it spent in court than to see Mrs. Turley's sister have any part of it; that she did not like her. Though the deed had been signed and the money sent, John Turley did not carry out the trade. The witness also states that either Mrs. Dundon or somebody else persuaded John Turley not to sign the deed. The witness, however, did not show that Mrs. Dundon ever had any conversation with Mr. Turley on the subject. Mrs. Dundon says that Dick Turley did say to her that the deed was there ready to be recorded, but his Uncle John would not sign it. She asked why. Dick said: "He won't; you ought to say something to him about it." Whereupon she replied: "I would rather see the courts get every cent of it than for her to get a cent of it." There had been some misunderstanding between her and her aunt. On account of this misunderstanding she made the remark. She never spoke to Mr. Turley in regard to the matter at all. In regard to the request that Dr. Mathers intercede in her behalf, she said that the Doctor asked her if her Uncle John had disposed of his property. She said, "Why no." The Doctor said, "He ought to be doing it." She then said, "Why don't you say something to him about it?" The Doctor replied, "You know you can't talk to Mr. Turley about things." In explanation of the statement of Dick Turley that she said she could get her uncle to do anything she wanted him to do, she said she could if he wanted to do it. When she asked for things and her uncle wanted her to have them, he would give them to her. If he didn't, he would say, "You know you don't need it." Other circumstances in connection with her influence over her uncle are referred to, but we deem it unnecessary to discuss them at length. On the question of Mr. Turley's mental capacity and his susceptibility to influence, a very large number of witnesses testified for the defendants. These witnesses were former business associates or men who had had business transactions with Mr. Turley and had known him intimately up to the time of his death. In expressing their opinion on the question there was no such uncertainty or doubt as was shown by witnesses for the plaintiff. These witnesses all declared that Mr. Turley was a man of fine mind and strong convictions. It was difficult to get

him to agree to do a thing, but when he said yes, he always stuck to it. Instead of being easily persuaded, he was rather stubborn or obstinate. He always had his own opinions about things and it was difficult to convince him to the contrary. There was practically no change in his mental condition up to the time of his death. These witnesses did not confine themselves to mere expressions of opinion, but gave many facts and circumstances on which their opinions were based. Indeed, the evidence to the effect that Mr. Turley had sufficient mental capacity to execute the deed in question, and that he was not susceptible to influence greatly preponderates. The most that can be said of the evidence for plaintiffs is that Mrs. Dundon did have some influence over her uncle. It must be remembered, however, that any reasonable influence obtained by acts of kindness or by appeals to the feeling or understanding, but not destroying free agency, is not undue influence. Undue influence over the mind of another is such as to destroy his free agency and to constrain him to do against his will what he would otherwise refuse to do. Watson's Exor. v. Watson, 137 Ky., 25, 121 S. W., 629. There was an utter failure to show that the deed in question was the result of any influence, much less undue influence, exercised by Mrs. Dundon. She was not at her uncle's home for several months before the deed was drawn. It is not shown that she even knew of the execution of the deed. A careful consideration of the entire record convinces us that the grantor was not constrained to do against his will what he otherwise would not have done. On the contrary, he knew exactly what he wanted to do and in executing the deed in question simply carried out a fixed purpose of his own. As the chancellor reached the same conclusion, it follows that the judgment denying the relief prayed for was proper.

Judgment affirmed.