## Creech, etc. v. Creech, et al.

(Decided May 12, 1925.)

Appeal from Harlan Circuit Court.

1. Evidence—Opinions of Nonexperts on Question of Mental Incapacity have Little Probative Value Unless Based on Facts Tending to Show Unsoundness of Mind.—Opinions of nonexpert witnesses on the question of grantor's mental incapacity, though admissible, are of little probative value, unless based on facts tending to show unsoundness of mind.

2. Deeds—Evidence Held Not to Support Claim of Mental Incapacity to Make Deed.—Evidence held not to support claim of mental incapacity to make deed.

3. Husband and Wife—That Husband Deserted First Wife to Live with Woman who Became Second Wife Held Not to Affect his Obligation to Latter.—That husband deserted first wife to live with woman whom he married after obtaining divorce held not to affect his obligation to second wife as his lawfully wedded wife.

4. Deeds—Evidence Held Not to Sustain Claim Second Wife Procured Deed Through Undue Influence.—Evidence held not to sustain claim second wife procured deed from husband through undue influence.

HALL, JONES & LEE for appellants.

W. A. BROCK and BROCK & BROCK for appellees.

Opinion of the Court by Judge Clay—Reversing.

By his first wife, Polly Creech, from whom he was divorced, Jonathan Creech had ten children. On March 30, 1920, a few days before his death, he conveyed to his second wife, Lucinda Creech, an undivided one-seventh interest in a small tract of land in which his mother owned a life estate. A few days after his death, his widow conveyed one-half of her interest in the property to Dewey Ison, her son by a former marriage, he having paid the funeral expenses, doctors' bills, and other indebtedness of her husband. This suit was brought by certain children of Jonathan Creech to set aside the two deeds on the ground of mental incapacity and undue influence. Judgment was rendered in favor of plaintiffs, and defendants have appealed.

The facts are these: Jonathan Creech and his wife, Polly, lived together for a number of years and had a family of ten children. When the youngest child was about fourteen years of age he became infatuated with Lucinda Ison, a widow living in the neighborhood, and tried to get a divorce in order that he might marry her. Though he failed to get the divorce, he continued nevertheless to live with Lucinda, and they moved across the line into the state of Virgina, where they lived for some time. Though some of his sons visited him while he was away, the other children resented his treatment of their mother, and their relations with him were never cordial. On the other hand, there seems to have been quite an attachment between him and his step-son, Dewey Ison. On one occasion he was sick at Mud Sulphur Springs, two of his sons visited him there, and on their return paid his expenses to the home of their mother, where he remained for about a month. As soon as he was able he returned to Lucinda and then procured a divorce from his first wife. He then married Lucinda and lived with her until his death, which occurred on April 25, 1920. Three or four years before his death he was in poor health and unable to support himself. At the request of his mother, who was a very old woman, he, Lucinda and Dewey moved to her home on the land in which his mother owned a life estate, and he owned an undivided one-seventh interest in remainder. From that time on, Lucinda waited on him and his mother, doing the cooking, washing and ironing for the family, and Dewey, who worked as a section hand, turned over to his mother his wages, which were used for the support of the family.

In support of the claim of mental incapacity and undue influence James F. Creech, one of Jonathan's sons, testified that when his father came to their home on a visit he received letters from Lucinda and afterwards left. He visited his father about four times before his death. When he first went in, his father looked "square out of his eyes" and he thought death was on him. His father stared at everything and when anybody came in he would watch them. He would roll his eyes, watch everybody, wring his hands at times, and watch the clock all the time. When Lucinda told his father that he had come to see his father it seemed that his father did not know him and tears came out of his eyes. He did not think that his father's mind was as good then as it had always been. While there, his father did not say much to him, but would watch Lucinda all the time. At the time he testified the children of his father were all married but him, and he had been divorced. Lewis Creech deposed that for three or four months before his father died his father would be in bed and at other times would be better and sit up. His father seemed not to be as wise as he ought to have been, and told him he was "so unthoughtable of anything he would go to do" he could hardly get it done. After the deed was made he visited his father and his father did not know him. At that time his father would try to talk to him, but he was so weak that he could not understand him, and tears would run down his cheeks. On one occasion his father gave him a cushaw and it seemed like he wanted to keep it hid. It seemed like Lucinda had influence over him. Anything his father wanted to buy for him he would go to her and talk to her before he would get it. His father was "high strung" enough to control his interests if it was against Lucinda's wishes, but he would not do it. On being asked if his father had strength of mind enough to intelligently dispose of his property, he said, "Well, I wasn't with him for about four months before he made this deed, but that last time I was with him he didn't have as good mind as he had been having." Last time he was to see his father was about a week before he died. At that time he was expecting to die. Frances Blankenship, a daughter, went to see her father about a month before he died. Her father did not know her, but thought she was another one of her sisters. He then began to cry and said it was a sight that a man did not know his children. After that she visited him again, but he was then very low and she

could not say whether he knew her or not. At the time she visited her father and he did not know her, there was only one small window in the room and it was about five o'clock in the morning. There was also a fire in the room. After her father married Lucinda she never went to his home until she heard that he was very low. One of her brothers was killed by the falling of slate, and her mother was drawing $48.00 a month as compensation. Joe Creech, another son, visited his father several times during his last sickness. He could not say whether his father knew his children or not, but heard him call "John," "Joe," and his father called him "John" a time or two. On being asked whether his father appeared to be in his right mind he answered, "He seemed to be part of the time, and part of the time he didn't. It seemed that his mind was coming and going. I watched him during a right smart part of his sickness, through the day, and I would have to leave off during the evening." On being asked whether his father's mind was as normal as usual, or to the contrary, he said, "Well, it seemed to be a little bit wrecked at times for because he was a very plain spoken man about his house during his health." He also said, "It seemed to me that in both body and mind he was weaker than he always was." When he visited his father, his father's mother was hardly able to go about. John Creech testified that he went to see his father in company with his sister, Mrs. Blankenship, and his father didn't seem to know who he was. His father broke down and cried and said, "It was bad for a man to get so he didn't know his own children." After that he was at his father's home and at times his mind would seem clear, but would then change and not be as good as at other times. He didn't think his father's mind was very good because he did not know at times whom he was talking to, and from the look in his eyes he didn't know what was happening. Worley Estep says that he saw Jonathan Creech in the months of March and April, and it seemed that his mind was badly wrecked.

On the other, Lucinda Creech and Dewey Ison, who testified without objection, both stated that Jonathan's mind was good when the deed was executed. They further stated that they did not procure him to make the deed, but that Dewey went for H. C. Lewis at the request of Jonathan. Lewis says that Jonathan wanted him to draw a will, but he told Jonathan that he could not do so. Jonathan then told him that if he did not get

better he wanted him to prepare a deed and would send for him. Later on, Jonathan sent Dewey for him and he prepared the deed. Jonathan said it was exactly what he wanted. At that time he did not notice anything wrong with Jonathan's mind. Elizabeth Creech, the mother of Jonathan, said that he was in his right mind at the time the deed was made and had often expressed the purpose of conveying the dower tract to Lucinda. Mary Ann Lewis, a sister of Jonathan, and her son, J. H. Lewis, say that they frequently saw Jonathan and that he was in his right mind up until a few days before his death. R. W. Cornett, a life-long friend and neighbor of Jonathan, says he had transactions with him in the month of March, only a few days before the deed was executed, and his mind was all right. Furthermore, Dr. D. M. Fields, who attended Jonathan during his last illness, testified that he never saw anything wrong with Jonathan's mind. He never was delirious, and always talked with good sense. In his opinion, Jonathan had mind enough to know what he wanted to do with his property, and to transact ordinary business. He did not see him at any time when he regarded him as being of unsound mind. On cross-examination he stated that if he got in a condition where he did not know his own children, his mind would be bad.

It is the rule in this state that the opinions of non-expert witnesses on the question of mental incapacity, though admissible in evidence, are of little probative value unless based on facts tending to show unsoundness of mind. Gilbert v. Osenton, 201 Ky. 653, 258 S. W. 99. Looking at the evidence in the light of this rule we find it consists of the opinions of plaintiffs based on the fact that their father did not recognize them when they first came into the room, and that there was a stare in his eyes. Though they were in the room and conversed with him for some time they do not tell of a single remark that shows that he was not at himself. On the contrary, they say that he himself commented on the fact that he did not know his children, thus showing that he understood and appreciated the situation. Then, too, it must not be overlooked that his inability to recognize his children may have been due to defective eyesight, or to the darkness of the room, which was lighted only by a small window and the fire that burned in the grate. Not only so, but an examination of the language of the witnesses shows an absence of certainty and conviction, even in the

opinions which they labored to express. Opposed to this evidence is the testimony of the physician that at no time during his last illness was Jonathan not in his right mind, coupled with the evidence of his neighbors to the same effect, and reenforced by the statement of the draftsman of the deed that his mind was all right when the deed was written. We are, therefore, constrained to the opinion that the claim of mental incapacity finds no substantial support in the evidence.

But it is insisted that a clear case of undue influence is shown. The argument is that Lucinda's influence over Jonathan was such as to cause him to leave his wife and family in the first place, and afterwards to leave them a second time. In addition to this, it is claimed that he was an invalid during the last years of his life and was not able to resist her importunities. However reprehensible Jonathan's conduct in deserting his wife and family and going to Lucinda in the first place may have been, it must not be forgotten that after he obtained the divorce from his first wife and married Lucinda she then became his lawfully wedded wife, and his obligations to her were the same as those of any other husband. This is not a case where the owner of a large estate gave to his wife far more than was necessary for her comfortable support, to the exclusion of his children, who were in needy circumstances. Jonathan's interest in the land was worth only a few hundred dollars. After paying his debts and funeral expenses it was not sufficient to support his wife longer than a year or two at most. His children were married and making a living. If the land had been given to them, the share of each would not have exceeded $40.00 or $50.00. Lucinda had waited on him and taken care of him during his last illness. He was estranged from some of his children, and the others rarely ever visited him and never contributed anything to his comfort or support while he was unable to take care of himself. In the circumstances, it was nothing more than natural that he should give his small estate to her whom he loved and who had borne the burden. It hardly can be said that one is constrained to do against his will that which his love and duty both prompt him to do. It follows that the claim of undue influence was not sustained.

Judgment reversed and cause remanded with directions to dismiss the petition.