## Hall et al. v. Drake et al.

(Decided November 26, 1929.)

J. SMITH HAYS and MARCUS C. REDWINE for appellants.

C. F. SPENCER and J. D. ATKINSON for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

On February 6, 1923, Z. T. Hall, a single man, conveyed to his niece, Lena Drake, a 200-acre farm lying on Red river in Powell county. The consideration was an agreement by the grantee to feed, clothe, and furnish the grantor with the necessary medical attention during his lifetime, pay his burial and funeral expenses, and do all things reasonably necessary for his comfort and happiness. The grantor retained the right at his option to sell and dispose of, for his own benefit, timber of the value of $250, and, in case he failed to exercise the right, the timber was to remain the property of the grantee.

There was the further provision that the compensation for a right of way for a highway across the land should be paid to the grantee and spent by her for improvements on the land. The deed also contained the following provisions:

"It is further agreed by the parties hereto that the second party shall have control in every way and manner and use all the land in the way she thinks proper, and the way she desires, but the first party shall not part with his ownership herein during his lifetime but at his death the party of the second part, her heirs, successors and assigns shall become the owner in fee, and that neither party during the life of the first party shall or in any way convey any of the land herein described or any interest therein further than the second party may lease or rent the same."

Z. T. Hall, the grantor, died intestate, a citizen and resident of Powell county, in the month of July, 1927. He was never married, and was survived by two sisters and numerous nieces and nephews, who resided in various parts of the country. On June 6, 1928, his nieces and nephews brought this action against Lena Drake, her mother, Henrietta Welch, and Margaret Faulkner, a sister of the grantor, to set aside the deed on the ground of mental incapacity and undue influence exercised over the grantor by the grantee and her mother, Henrietta Welch. On final hearing the chancellor refused the relief prayed, and plaintiffs have appealed.

It is first insisted that, inasmuch as the deed provided that the first party should not part with his ownership during his lifetime, but that at his death the party of the second part should become the owner in fee, no present interest passed to the grantee, and, that being true, the deed was in effect a will, and therefore invalid because not properly witnessed. This position is not tenable. Notwithstanding the language referred to, the grantee, with the exception of the timber of the value of $250 and of the compensation for highway purposes, which was to be used for improving the land, was given the right to control and use the land in any way she saw proper, with the further right to lease or rent the land. In other words, she was granted, with certain exceptions, the entire beneficial ownership of the property, with the

right to occupy and use it, and enjoy all the profits and income therefrom. It is therefore clear that the case is not one where the deed merely appointed what was to be done after the death of the grantor, but is a case where it was intended to vest, and the deed did vest, a present interest in the property. That being true, the instrument is not testamentary in character, but is in fact a deed. Taylor v. Purdy, 151 Ky. 82, 151 S. W. 45.

Another insistence is that the court erred in sustaining a demurrer to so much of the petition as sought a recovery of rents and profits accruing since the execution of the deed. Whether this ruling was proper or not, we need not determine. Certainly it was not prejudicial if the chancellor's refusal to set the deed aside was proper, a question which we shall proceed to consider.

On the question of mental incapacity and undue influence, the evidence is as follows:

J. Henry Hall, a nephew of the grantor, testified that he saw the grantor about a month before his death. He seemed to be sick physically, and he could hardly say what his mental condition was, but "he was sick mentally, too." At that time he seemed depressed. Prior to that occasion he had seen the grantor several times, and the grantor seemed to be distressed about getting back home. The grantor's mind was not normal. He seemed to be easily influenced. He did not seem to be capable of taking care of his business. He used peculiar expressions in his talk, causing comment and ridicule. For butter he would say "booter"; for no he would say "now." The father of witness would have been around 75 if living. There was a difference of two to four years between his father's age and Z. T. Hall's age. Z. T. Hall lived with his sister, Mrs. Welch, about a year when his hip was broken. It must have been about 1920 or 1921. Mrs. Drake also lived there. Mrs. Welch seemed to have influence over Z. T. Hall. Witness had heard him make remarks about talking to his sister, but could not recall any of them.

G. B. Conlee, who lived at Stanton, testified as follows: He had known Z. T. Hall all his life, had lived on his farm from March, 1922, to March, 1923. During the time he rented the farm he got the crop and gave Mr. Hall $65 a year. He thought it was that much trouble to take care of Mr. Hall. Hall was peculiar, and there were

some things he did not like very much. Mr. Hall was all the time complaining of being sick and taking medicine of one kind or another. He did not know whether he knew his mental condition. Mr. Hall wanted to know what he would give for the land and keep him. He told Mr. Hall he would give him $7,500 for it, and keep him five years. Mr. Hall counted up the interest on $7,500, counted up the amount of clothing that would keep him. He was pretty good in his head. He did not remember whether Mrs. Drake or Mrs. Welch was up there or not. Mr. Hall went down there a few times. At that time Mrs. Drake was teaching school and living with her mother. Mr. Hall declined to make a new trade with him, saying that he had promised to give it to Mrs. Drake. Mr. Hall was a kind of droll fellow. He could not say whether his mental condition was good or bad. About a month after he made Mr. Hall the proposition, Mr. Hall conveyed the property to Mrs. Drake.

Thomas Boone, who was deputy county clerk in the year 1923, testified as follows: He took Z. T. Hall's acknowledgment of the deed to Lena Drake. He reckoned it was at Uncle Zach's. He did not remember seeing Mrs. Drake there, but thought she was there. He could not remember whether Mrs. Welch was there. He went to the farm early in the morning. Some of them told him to go. The first person he saw was Mr. Zach Hall, who invited him into the family room. He got the deed out of his pocket and showed it to Zach. He could not remember who gave him the deed. When he presented the deed, Mr. Hall said, "Tom, ought I to sign it or commit suicide?" Afterwards Mr. Hall read the deed over three or four times, and would make that remark each time. He had no arrangements with anybody about appearing at the house at that particular time. He did not think that any of the family persuaded him to sign it. After Mr. Hall signed the deed, he took it and thinks he delivered it at Mrs. Welch's to Mrs. Drake. He would think that the grantor read the deed enough to understand it. He saw nothing about Mr. Hall to indicate that he was a different person from the one he had always known. He was always a "peculiar fellow." He was a man that read a great deal. He traded a good deal some years ago. He did not think he had seen Mrs. Drake for a month before he went there. He thought

that he went down to Mrs. Welch's house and received pay after the acknowledgment.

Louis Johnson testified as follows: He lived with Mr. Hall pretty much every winter for several years. The winter that he made the deed to Mrs. Drake was the last winter that he stayed with him. He took a good deal of medicine and complained that it did him no good. He "seemed to be acting funny." His mental condition was pretty bad, and he seemed to have no judgment about things. Said he ought to have a guardian. He would say "poy" for pie, and "booter" for butter. His condition was worse when he left. It seemed to him that he was "off" some. He could not exactly say how much of the time he was "off." As Mr. Hall got older his mind got worse. He was judging Mr. Hall by himself. He talked "right smart" during the last years. He did not talk as much as he used to. Mr. Hall had two dogs that stayed in the room with him. "It does not seem to me like he was of sound mind." While there, Mr. Hall did not pay him anything. He just did the cooking and the housework. The rest of the year he just traded and trafficked around. His own recollection was bad. It began to grow bad about eight or nine years ago. Maybe both his and Uncle Zach's minds were affected when he was up there. For several years past from the time he testified he was being maintained at the expense of the county. There was further evidence that Green Hall, a brother of Z. T. Hall, and Carrie Shimfessel, a niece of Z. T. Hall, had been declared insane.

This is not a case where a man, advanced in years and of a weak mind, conveyed his property to an active young man with whom he lived and who was attending to his business, thus creating a presumption of undue influence and imposing upon the grantee the burden of showing the fairness of the transaction. Though it is claimed that the grantor was living with his niece at the time, the record does not support this contention. On the contrary, it shows that the deed was made at the grantor's home at the time he was living with Mr. Conlee, and though it may be that the grantor sometimes consulted with his sister, Mrs. Welch, and her daughter, Lena Drake, about his business affairs, there is no showing that he had given up looking after his own affairs, or had surrendered their management to his sister or

niece. There being no presumption of undue influence, the burden was on appellants. Stripped of all surplusage, the evidence relied on to show mental incapacity consists of vague, indefinite expressions of opinion given by non-expert witnesses to the effect that the grantor was sick mentally; that his mind was not normal; that his mentality was very bad; that he had a good many imaginary diseases; that he seemed to be worried about things all the time; that he seemed to be acting funny; that he seemed to have no judgment about things; that as he got older his mind got worse; that he did not seem like he was of sound mind; supplemented by evidence that his brother and niece had been declared of unsound mind. In giving their testimony as to Mr. Hall's mental condition, the witnesses gave no facts to support their conclusions other than when he went to town he was in a hurry to get back, or that he was a great hand to buy medicine, or that his pronunciation of certain words was peculiar. In the circumstances, their opinions are of but little value, and fall far short of showing a lack of mental capacity on the part of the grantor. Clearly, if the grantor had been lacking in mental capacity at the time the deed was executed, it would have been possible to establish that fact by evidence more substantial than that introduced by appellants. Taking up the question of undue influence, we find that the grantor was careful to guard his own interests in the deed which he executed. His only relatives were his nieces and nephews. Those who attacked the conveyance did not live near him, but were scattered throughout the country. No intimacy existed between him and them. On the other hand, he lived near his sister and her daughter. The evidence is not clear that either of them was present when the deed was executed. It may be that they even suggested the propritey of his making the deed, but neither this suggestion nor any other fact in the evidence is sufficient to justify the inference that the grantor was constrained to do against his will that which he otherwise would not have done.

On the whole, we see no reason to disturb the finding of the chancellor.

Judgment affirmed.