## Laun v. De Pasqualte.

(Decided May 18, 1934.)

DAVID A. McCANDLESS, MORTON K. YONTS, LORAINE MIX and ROBERT HAGAN for appellant.

M. B. GIFFORD and DUDLEY L. CLARKE for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Affirming.

From an unsuccessful effort to set aside two deeds made by her sister, Mrs. Laun appeals. Mrs. Carolin Lapp De Pasqualte died July 26, 1926, she had never had any children, her parents were dead, and her only near relative was her sister, Mrs. Sophia Lapp Laun. Mrs. De Pasqualte was survived by her husband, Antonio De Pasqualte, to whom she had by her will dated December 1, 1913, devised her property. She had also made two deeds (more extensively discussed later) under either of which he would take her property. Before Mrs. Laun could get her sister's property, it was necessary that she get these three documents out of her way. She prosecuted an appeal from the order probating the will of her sister and on hearing thereof the paper was found not to be her will and as no appeal was prosecuted from that finding that matter ended there, and this record contains her efforts to overcome the two deeds we have mentioned.

Mrs. Laun and Mrs. De Pasqualte were the only children of Theodore Lapp, who died in the year 1902. He devised his estate to Mrs. De Pasqualte, then Carolin Lapp, and charged against it $2,000 to be paid to

Mrs. Laun. The evidence shows Mr. Lapp's estate consisted of a combined storehouse and residence worth about $3,000 and a stock of groceries worth about $1,000; so it appears the old gentleman had made an equitable division between his daughters and that they received about $2,000 each. Mrs. De Pasqualte had purchased three other pieces of property shortly before that, the consideration therefor being in those deeds recited as cash, and which aggregated about $4,500. Whether this $4,500 represented savings she had, was money she had borrowed, or was money her future husband, Antonio De Pasqualte, had let her have, as he claims, does not appear if his evidence is excluded.

In 1904, after a courtship of about five years, Miss Carolin, then aged about 40, married Antonio, then aged about 39. This was Miss Carolins' first marriage, but Antonio was a nuptial veteran, he having been twice previously married to women from whom he claims to have been divorced.

## The Husband.

Antonio is and was an odd character. He was born in Italy and lived there until he was about 21 years of age and was there married. He left that wife in Italy and claims he was divorced from her while living in Geneva, Ill., and that his next marriage and subsequent divorce took place in Memphis, Tenn. He was a sort of a "Jack at all trades," but his chief occupation was that of a chimney sweep or, as he says, he was a "Chimney doctor." He dressed in a sort of a carnival costume, drove about in a fantastic rig, ornamented by gaudy signs and equipped with a gong which he rang continuously. He was noisy, loud mouthed, rough, and high tempered. He was unable to read or write, but he worked hard and made money.

## The Wife.

Mrs. De Pasqualte was of German extraction, she was educated in German, had graduated from a school conducted in that language, and while she could speak English, she preferred to speak German. She appears to have been a meek, patient, industrious, and very economcial woman. About 1912, an ulcer or stubborn sore developed on her right foot which troubled her for years, and in May, 1915, she fell and broke her right leg near the ankle, and this fracture never properly or

entirely healed and she suffered therefrom more or less as long as she lived. The marriage of these two resulted in a complete estrangement between Mrs. Laun and her sister, she did not attend the wedding, and there is no evidence these two ever saw or spoke to each other again, although the De Pasqualtes had a telephone, and while there were two telephone systems in Louisville they had two, yet Mrs. Laun in her testimony does not even say she telephoned her sister. She had no use for De Pasqualte and he cordially disliked her.

### The Life and Usages of the De Pasqualtes.

Mr. and Mrs. De Pasqualte had but little use for banks, they made few deposits, but rented boxes from them, to which they both had access and in them they kept money, and they would visit these from time to time, sometimes together and sometimes singly, and would then make additions to or subtractions from their hoard according to their means or necessities. The homes they built were in architecture and in furnishing somewhat unusual, but they were comfortable. They kept their larder well stocked and were what is termed good livers. For a few months Mr. and Mrs. De Pasqualte lived over and conducted the grocery, then that was sold, and they moved to the property on Walnut street. Later they built a second home, on that street and lived there until 1916, then they bought about 11 acres of land on the Cane Run road, built a house on it and lived there for three years, then returned to their Walnut street home for three years, and from 1922 to her death they lived again on their Cane Run property.

### The Deeds.

The title to all of this property was in the name of Mrs. De Pasqualte, although the evidence shows Antonio conducted the negotiations for and paid for the Cane Run property and contracted and paid for the construction of the buildings upon it. On July 5, 1919, Mr. and Mrs. De Pasqualte conveyed all of this property to a trustee, who reconveyed it to them as joint tenants so long as they both should live with a fee-simple title in the survivor—a tenancy by entirety. 30 C. J. 566, sec. 99. On March 14, 1924, they again conveyed all their property to a trustee, who reconveyed it to Mr. De Pasqualte, and these are the two deeds Mrs. Laun asks the court to cancel. The pieces of property in controversy are worth about $20,000.

There are fifteen volumes of evidence, hence its bulk renders it impossible to discuss it in detail, and we shall confine our discussion of it, in the main, to the conclusions we have reached therefrom.

In her petition Mrs. Laun alleges these deeds were executed without consideration, that Mrs. De Pasqualte had not, when they were made, sufficient mental capacity to make them, and that their execution was obtained by duress and by the exercise over her of an undue influence on the part of her husband, the grantee therein.

## The Consideration

The chancellor in his opinion said:

"With the exception of the $2,000.00 received from her father's estate, Mrs. De Pasqualte had nothing nor had she earned anything by her labors. It is obvious, therefore, that the De Pasqualte fortune was the product of the industry and frugality of De Pasqualte. * * * To a childless woman, as Mrs. De Pasqualte, was, whose only near relative has neglected and abandoned her, the natural object of her bounty, in the absence of an estrangement, would be her husband and a voluntary transfer of property to him would be all the more likely where he has paid for the property. * * * It was, therefore, not unnatural that Mrs. De Pasqualte should expect and desire, that her husband should have this property at her death."

Our conclusion is that the evidence fully supports the chancellor on this score.

## Mental Capacity.

One physician testified he attended her from 1919 until her death, that she was paralyzed in both legs, was an invalid confined to her bed or a wheel chair, had the mind of a child, weighed 80 pounds, was incapable of transacting business, that he had seen bruises on her arms, body, and face, had often seen her eyes blackened, but he did not know what caused these, and that he never saw any change in her mental condition, and that physically she did not improve, but gradually weakened down until she died. On cross-examination he was unable to give the date of any of his visits or the number of them, but he testified Mr. De Pasqualte was kind and

affectionate to his wife, paid him for his visits, and that his wife had plenty of everything needed for her comfort.

Witnesses, who worked in or called at the home of these people, say Mrs. De Pasqualte looked terrible, looked crazy; water ran out of her eyes, she looked scared, she was crazy, did not know them, had a bad color, talked at random, mumbled and talked to herself, looked like a witch, had a dull look, was weak-minded, was childish, looked like a child, would start to say something and not finish it, talked weak, would sing and hum and then cry, could not control her bladder or bowel evacuations, soiled her bed, had to be cared for like a baby, did not have mind enough to tell when she needed attention, would not answer when spoken to, looked like she was haunted, had a blank stare, seemed to be in a stupor, that you could not understand her, that she had no memory, did not talk rational, etc.

These inquiries covered a period of about fifteen years before her death. This poor woman was a great sufferer; we have mentioned the stubborn ulcer, and her fractured leg. At the time of this fracture or in its healing, a nerve was injured or affected in some way, so that a chronic and intensely painful neuritis resulted. Everything these witnesses said may be true, but many of them either called on her and made some sort of contract with her, or tried to make one. This woman was not always in that condition. Her regular physician was Dr. Schott, who is now dead. Other physicians attended her. Dr. Allen saw her in the spring of 1926. He testified she was rather sick, but that her mind was not affected, that she answered his questions intelligently, and that her mind was sufficient that she could have made a deed. Dr. Gatz saw her several times. He was there with Dr. Schott, when they were trying to get her fractured leg to heal. He made several calls upon her for Dr. Schott; he saw her three times in January, 1924, four times in 1925, and eight times in 1926, the last visit being on May 15th.

He testified that from the first time he became acquainted with her in 1913, to his last visit to her in 1926, there was never anything wrong with her mind, whatsoever. That she had multiple neuritis, and suffered great pain, but when he visited her she would discuss with him her afflictions and tell him how she was af-

fected, and that there was no question about her knowing positively what she was doing.

Dr. Wilhoit treated her in 1904 or 1905, and again in 1921, 1922, 1923, and 1924. He testified she was suffering from a traumatic neuritis, resulting from her fractured leg and had some rheumatism in her hands. He saw her five times in 1921, five times in 1922, seven times in 1923, and nine times in 1924. He testified she weighed about 140 pounds, that she was not paralyzed, that she was of reasonable intelligence, that her facial expression indicated brightness of mind, that there was nothing whatever the matter with her mind and she had the mental capacity to make a deed if she wanted to, and that she had pleasant comfortable surroundings.

Dr. Bradley, a veterinarian, testified to having been called by her to see a horse and a dog on different occasions. He described her as a woman that would weigh about 155 pounds, that she talked to him about these animals and how to care for them, that she talked intelligently, that she paid him, that she seemed to be a close, hard bargainer, that she seemed to have a bright mind, and he could not see anything wrong with her.

The defense showed Mrs. De Pasqualte was not bedfast all the time, that she would be better at times and would be able to get up and get about her house without the use of crutches, and there is evidence for the defendant that she took interest in her flowers, selected the hardware for her house, selected paper for it on diffrent occasions, directed the painting and cleaning of it, had furniture repaired, helped with the cooking, gave direction to carpenters relative to changes they were making in the house, ate with the family, collected rent, gave receipts therefor, answered the telephone, and made memoranda of the calls when they were for her husband. All of the witnesses for the defendant. and there are over 90 of them, testify Mrs. De Pasqualte was as intelligent a woman as they had ever seen, there was nothing wrong with her mind, she could carry on a conversation as well as anybody, her eyes looked strong, talked with as much sense as any one, had strong mind, she seemed all right, a person of intelligence, her face denoted intelligence, she was bright, talked like a sensible person, she acted normal. nothing in the world wrong with her, talked naturally like any one else, was a nice, quiet woman, carried on a conversation just like

any one else would, had an active mind, attended to a lot of business, looked all right, preferred to talk German, but talked English all right, no trouble to understand her, had bright pretty eyes, her mind was all right, her mind was sound, she knew what she was talking about, her mind was above the average, she transacted business, understood what she was doing, she was very bright, she talked very intelligently, was a very intelligent woman, seemed to be the same as any other man's wife, seemed like any other business woman, took orders for her husband, did some of her own work, cooked, washed dishes, she showed intelligence, her mind was good, etc. Mrs. De Pasqualte talked to herself, in the German language, and this, it turns out, is the mumbling the plaintiff's witnesses were unable to understand.

The officer, who took her acknowledgment to the deed made in 1924, testifies to her capacity to make it and her understanding of it, and the testimony of the attorney, who, as a notary public, took her acknowledgment to the deed made in 1919, is to the same effect. The finding of the chancellor that she had mental capacity to make these deeds is certainly supported by the evidence.

### Undue Influence.

As Mr. and Mrs. De Pasqualte were husband and wife, it is urged for reversal that this placed upon Mr. De Pasqualte the burden of showing no undue influence was exercised by him in procuring his wife to sign these deeds, and the following cases are cited in support of that contention: Gregg v. Hedges' Guardian et al., 227 Ky. 268, 12 S. W. (2d) 854; Willoughby v. Reynolds, etc., 182 Ky. 1, 205 S. W. 947; Hoeb v. Maschinot, 140 Ky. 330, 131 S. W. 23; Herzog v. Gipson, 170 Ky. 325, 185 S. W. 1119; Davidson v. Davidson, 180 Ky. 190, 202 S. W. 493; Tucker v. Cornett's Adm'r, 190 Ky. 786, 228 S. W. 428; Watson v. Watson, 190 Ky. 270, 227 S. W. 270; Gross v. Courtley, 161 Ky. 152, 170 S. W. 600; Thompson v. Thompson, 209 Ky. 677, 273 S. W. 522; Rounds v. Rounds, 220 Ky. 98, 294 S. W. 785; Hitchcock v. Tackett, 208 Ky. 803, 272 S. W. 52; Koger v. Koger, 92 S. W. 961, 29 Ky. Law Rep. 235.

In those opinions it is in substance written that such a burden would be upon him. Let us for a moment consider the weight of this burden, looking first at the weight that Mrs. Laun and her counsel attributed to it.

If they had regarded what these opinions said about this burden as literally true, then as soon as the petition was filed they would have felt they were entrenched behind a prima facie case which the defendant had to overcome by proof and they would have simply remained within their fortifications and waited for the defendant to attack them by coming forward with his proof. They did not do so, but they took the offensive and put on their proof first, thus showing they did not consider their case established, and they acted wisely, for if no proof had been offered by either side the court would certainly have dismissed the petition. This shows there is practically no weight to this so-called burden, for it does not even amount to such a legal presumption as would force the party against whom it is indulged to come forward with his proof.

In cases involving undue influence, the evidence is never the same, each case must depend on its own peculiar facts, and one case will rarely serve as a precedent for another. Here are some cases which we regard as more applicable here than the cases cited by plaintiff: Wood v. Moss, 176 Ky. 419, 195 S. W. 1077; Chrisman v. Quick, 174 Ky. 845, 193 S. W. 13; Gatlin v. Allen, 174 Ky. 225, 192 S. W. 26; Collier v. Dundon, 164 Ky. 345, 175 S. W. 635; Gusler v. Hays, 154 Ky. 306, 157 S. W. 376. Husband to wife, Sellers v. Sellers, 162 Ky. 9, 171 S. W. 449; Creech v. Creech, 208 Ky. 845, 272 S. W. 36. Father to son, Akers v. Akers, 101 S. W. 353, 31 Ky. Law Rep. 36; Parsley v. Parsley, 233 Ky. 42, 24 S. W. (2d) 931; Thacker v. Coleman, 239 Ky. 333, 39 S. W. (2d) 510. Father to daughter, Tunks v. Vincent, 241 Ky. 379, 44 S. W. (2d) 282. Husband to wife and daughter, James v. Cullins, 214 Ky. 179, 282 S. W. 1106. Mother to daughter, Brewer v. Allhands' Adm'r, 251 Ky. 178, 64 S. W. (2d) 469. Woman to foster daughter, La Rue's Committee v. Williams, 211 Ky. 398, 277 S. W. 462. Grandmother to grandchild, Barbee v. Stokes, 110 S. W. 341, 33 Ky. Law Rep. 439. Brother to brother, Schenk v. Schenk, 240 Ky. 237, 41 S. W. (2d) 1102. Uncle to niece, Hall v. Drake, 232 Ky. 127, 22 S. W. (2d) 568. Uncle to nephew, Dixon v. Dixon, 236 Ky. 608, 33 S. W. (2d) 611; King's Widow and Heirs at Law v. King, 221 Ky. 775, 299 S. W. 960. Grandfather to wife of grandson, Woody v. Davis, 237 Ky. 768, 36 S. W. (2d) 360. Woman to her physician, Petty v. Pace, 207 Ky. 592, 269 S. W. 713. Bachelor to friend, Applegate's Adm'r

v. Jones, 220 Ky. 205, 294 S. W. 1032. Woman to friend, Sherman's Ex'r v. Keller, 225 Ky. 25, 7 S. W. (2d) 496. Grandfather to grandson, Murray v. Thomas, 221 Ky. 737, 299 S. W. 727; Mahuron v. Mahuron, 208 Ky. 825, 271 S. W. 1093. We have found no case of wife to husband in this jurisdiction, but they may be found elsewhere. Stiles v. Breed, 151 Iowa, 86, 130 N. W. 376; Steketee v. Newkirk, 173 Mich. 222, 138 N. W. 1034.

We are asked by plaintiff to cancel two duly and regularly executed, authenticated, and recorded contracts of which we said in Lossie v. Central Trust Co., 219 Ky. 1, 292 S. W. 338, 340:

> "The cancellation of an executed contract is the exertion of the most extraordinary power of a court of equity, which ought not to be exercised, except in a clear case and on strong and convincing evidence."

That was a case involving fraud, duress, undue influence, and mental capacity, and the language just quoted was itself taken from earlier decisions, and it has since been cited and followed in Perry v. Thomas, 232 Ky. 781, 24 S. W. (2d) 603, and numerous other opinions.

We are going to state some of the evidence relied on by the plainiff, but shall preface our statement by saying we are following the trial court in attributing very little credibility to the testimony of Georgia Schefflein and Bertha Lightcap.

Mrs. Klump testified she came to get Mrs. De Pasqualte to go with her to visit Gus Laun, who was then on his deathbed, and that Mr. De Pasqualte struck the table with his fist and said she could not go, whereupon Mrs. De Pasqualte cried and said: "God help it, I can't go!" Mr. De Pasqualte did wrong in not allowing his wife to visit her dying nephew, but we must remember Mrs. Laun had ceased to have anything to do with her sister because of her marriage to De Pasqualte and there are none we dislike so cordially as those who regard us as made of inferior clay and while this conduct was brutal, still we are dealing with the conduct of a most ignorant man, and we regard this conduct as churlish and indicating lack of refinement, yet withal as most natural.

### The Chains on the Doors.

The home of the De Pasqualtes had one or more of

the doors fitted with ward-chains, and these are cited as instruments of torture and the wife is pictured as a prisoner. Wardchains are very simple articles of hardware, they cost but a tifle, and by the use of them upon a door, it renders it impossible for the door to be opened more than six or seven inches unless some one on the inside removes the chain. They are in quite common use, for the purpose of keeping out unwelcome intruders; they are sometimes referred to as "Book agent chains," and may be found in most any hardware store and are listed by Sears Roebuck & Co., in their catalogue under No. 9D4797 as door guards.

There is evidence that Mrs. De Pasqualte had been heard crying and begging for water when her husband was present. Mrs. De Pasqualte was sick much of the time, and we have no evidence she was not sick at this time, nor have we any evidence that in her then condition the free drinking of water was good for her.

### De Pasqualte's Treatment of His Wife.

John Marshall, a colored man who lived next door to the De Pasqualtes, testified:

"I have heard her crying and begging for water, or something like that. I have heard it several times. I have heard him quarrel at her; I have heard him curse her, and I have heard him say things when he would come out of the house, the things he would say, I would rather not repeat them. It was pretty vile language. I heard her say to quit pinching her, and 'Please stop hitting me; I haven't done anything to you,' and I would hear him curse back at her. He would speak pretty rough towards her, or he would say, 'You don't want anything,' or 'You are always begging for something.' I have heard him call her 'Old fool' and different things. It was very vile and vulgar —very vile and vulgar. Several times I have heard him, I don't know what he would say, but she would say, 'Oh, I don't want to be bothered with that paper; maybe tomorrow I will feel better—I don't want to be bothered with that paper.' I have heard her say that several times. When asked when Miss Lightcap came, he said: I can't remember whether it was in 1818 or 1819, I mean 1918 or 1919. I don't remember just now what year but it was along in there somewhere.

"I know both of their voices. That was Mrs. De Pasqualte's voice that was begging him not to pinch her or not to hit her, that she had never done anything to him, or to don't do that.

"Q. How often did that occur—her crying out about him pinching her? A. Several times. I couldn't count the times, because I have heard it quite often.

"Q. Did anyone else live in the house at the same time you were living there? A. Myself and wife, and her brother, Luster Alexander. I lived there from the time we moved there, up till this last Sept.

"Q. You first moved there—in 1914, you say? A. Yes, sir."

This witness was asked if he was ever in the De Pasqualte house, and answered:

"Not the whole time I lived there, but once, and that is after they moved away, never spoke to her in my life."

His wife, Anna Marshall, in her testimony said:

"I heard Mrs. De Pasqualte say, 'Oh Lord rain, pour down rain, I want a drink of water so bad.' There was nobody there but her. I heard her holler, 'Lord have mercy don't hit me, don't hit me, Oh God have mercy.' Mr. De Pasqualte was there. He left and went out on the front porch and seemed to be excited. She would cry most any time but I never heard but one time crying out, 'Oh mercy don't hit me.' Only in there one time to see her. Don't know who was in the room that she was talking to. I didn't see him in there and didn't see him hit her. I just heard some muttering. I never heard any distinct words and I could not say what they said.

"Q. Could you tell whether it was a man or a woman doing the muttering? A. No, sir.

"78. Were any other people living in your house with you at this time? A. No, sir.

"79. Just you and your husband? A. Yes, sir."

Let us examine the testimony of this man and his

wife. He testified Friday, November 19, 1928, and she on November 12th. Thus we have, in the examination of the testimony they gave, the advantage that arises from their separate examination, which is a great aid in the discovery of the truth as we pointed out in Ray v. Com., 241 Ky. 286, 43 S. W. (2d) 694, when we called attention to the failure of the witnesses against the chaste Susanna "to agree together." In that old Bible story it was said of those witnesses: "Daniel had convicted them of false witness by their own mouth." (See verse 61.) The Sanhedrin hesitated to convict the Nazarene, "For many bore false witness against Him, but their witness agreed not together." Mark 14:56.

Marshall and his wife had equal opportunity to hear what went on in this home, yet she says she never heard Mrs. De Pasqualte say, "Don't hit me," but once, while her husband's testimony is that he heard that "several times"; that he heard it quite often. It is strange, if it occurred so often he "could not count the times," that his wife only heard it once. It is strange he heard Mrs. De Pasqualte say "several times," she did not "want to be bothered with that paper," and yet his wife should not testify that she heard such. It is strange that John Marshall testifies his brother-in-law, Alexander, lived with them, yet his wife testifies no one lived with them. All the witnesses testify De Pasqualte was loud-mouthed, yet John Marshall could not hear what he said to his wife about these papers. It is strange these two should testify to these acts of brutality, yet no such testimony should come from any of the other, more than 100, witnesses, many of whom lived right in the De Pasqualte home. It is strange he says Miss Lightcap came in 1918 or 1919, yet all other witnesses say she came in 1916. This lack of agreement weakens the credibility of the testimony of the Marshalls.

### De Pasqualte's Rude Remarks.

Plaintiff introduced a colored woman, a neighbor of the De Pasqualtes, who testified she visited them and that about 1919 she heard De Pasqualte say of his wife:

"'God damn her old soul I have the notion to kick hell out of her,' and he drew back his foot but he didn't kick her."

Another, who was a servant in the house for about two weeks, testified he said:

" 'Carolin, you are not dead yet. Why don't you die and get out of the way, you are not any more good here.' He said those very words, several times. He was not fussing. He just came through the house and said those words. I don't know whether he was joking or nót.''

Another, now an inmate of the county infirmary, who cooked there in 1918 or 1920, testified he said:

''Carolin, I don't see why in the hell you don't die. I am a young man and I like to have comforts in this world.''

Those remarks De Pasqualte denies, but if made they were rude, but we must remember the De Pasqualtes were not people of refinement and did not move in the best social circles of Jefferson county. These remarks, if true, only show him to be a coarse, ill-bred barbarian; they do not show her imbecility, or that he had an undue influence over her, and in view of the great mass of evidence that he was kind to his wife, procured for her the services of nurses, housemaids, and physicians and provided her with physical comforts, we are disposed to treat those remarks, if made, just as his wife did, as the words of a clownish boor, and to attach to them no great importance.

## The Woman in the Case.

In November, 1916, in answer to a newspaper advertisement, a Miss Bertha Lightcap (then 19 years of age) came to see Mr. and Mrs. De Pasqualte and arranged with them to do housework for them; she remained with them for a short time, then returned to her home in Lexington, Ind., she was with them again for several months in 1917 and again in the fall of 1918, some in 1919, and so on intermittingly, except during the year 1924, when she bought and conducted a laundry, until the death of Mrs. De Pasqualte in 1926. This poor woman now occupies a most unfortunate position in society; she is neither maid or matron, wife or widow, for at the Home of the Friendless in Louisville there was born to her on July 21, 1921, a child, the result, so she says, of her relations with De Pasqualte. Later she returned to the De Pasqualte home with her child and continued to work there intermittingly. Mrs. De Pasqualte saw the child there, became fond of it, and there is some evidence she contemplated creating a trust for

its education, and a few months before she died, she and her husband conveyed to Miss Lightcap a city lot of no great value. Both De Pasqualte and Miss Lightcap testify that this was conveyed her in settlement for money they owed her for services rendered them. It is claimed that she is, and has been, De Pasqualte's mistress. Whether or not Mrs. De Pasqualte knew or suspected her husband to be the father of this child does not appear, but it is argued that if she did not, she was a mental imbecile, and if she did—and we gather from this record that perhaps she did—and yet allowed this woman to remain there, it was even greater evidence of such imbecility, or else that she had been completely overmastered and entirely subjugated to these two alleged adulterers. Whether she would tolerate it or not, if she knew, we do not know; but Rachel procured a mistress for Jacob. Gen. 30:4. The wife of Charlemagne lived in amity with mistresses of her illustrious husband; Henry Fitzroy, the bastard son of Henry VIII and Elizabeth Blound, was reared in the royal household and kindly treated by his first wife, Catherine of Aragon; the wife of the Earl of Beaconsfield (Disraeli) lived in cordial relation with his mistress; the wife of Alexander Hamilton did not dismiss him after his public confession of having so lived with Mrs. Reynolds; and Mrs. Beecher lived with her husband as before, after his relations with Mrs. Tilton had become notorious; so why should we say poor suffering Mrs. De Pasqualte was an imbecile because she did the same. De Pasqualte has not admitted that he is the father of this child, and so far as we know he may be entirely innocent and the suit aginst him for its support may have been, as he terms it, "A frame up."

### Duress.

The chancellor in his opinion said:

"There is not a syllable in the testimony to support the claim that these conveyances were obtained by duress. Let it be assumed for the sake of argument, that De Pasqualte was a man of rough and brutal nature. * * * surely it cannot be said that duress has been established merely by showing that it was not inconsistent with the character and interest of the party accused of it."

These deeds were solemnly executed, and the evi-

dence certainly does not induce that clear conviction that is required to justify their cancellation.

The judgment is affirmed.