## Brewer v. Allhands' Adm'r et al.

(Decided April 21, 1933.)

WOODWARD, HAMILTON & HOBSON and OLDHAM CLARKE for appellant.

BOOTH & CONNER and PERCY N. BOOTH for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Reversing.

Mrs. Brewer has appealed from a judgment, by which this document was canceled:

"This writing witnesseth that I have this day transferred, set over, and delivered to my daughter, Lillian Allhands Pearcy Brewer, to be hers absolutely, all of my securities consisting of United States Government Liberty Bonds.

"My estate, by reason of necessary expenditures made therefrom, is already less in value that

(than) the amounts which I have heretofore advanced to my other children, and I make the foregoing transfer to my daughter, Lillian Allhands Pearcy Brewer, in order to compensate her for the care, nursing and attention which she has rendered me during the past twenty-five years, it being my intention to vest her with, and I do hereby vest her with, the possession of, and the immediate, full, and absolute title to all of my securities of every kind and description.

"In testimony whereof witness my signature this 25th day of June, 1927.

Her

"Mary A. X Allhands.

Mark

"Witnesses: Jno. J. Moren, Mrs. Lillie Marie Owings, Mrs. C. H. Culley, Mrs. Lora Brotzge."

On September 21, 1927, Mary Ann Allhands died intestate a resident of Jefferson county, Ky., at the age of 94 years and 10 days, leaving surviving her three children, Lillian Allhands Pearcy Brewer of Louisville, Mary Frances Montgomery of Cincinnati, and George R. Allhands of New York. For more than 15 years prior to her death, Mrs. Allhands had lived with Lillian Allhands Pearcy Brewer and her husband, John H. Brewer, in their apartment in the Gaston building on Fourth street across from the post office in Louisville, and for a number of years before moving to the Gaston building, Mr. and Mrs. Brewer lived with Mrs. Allhands in her home at Sixth and Oak streets in Louisville. During the last 15 or 20 years of her life, Mrs. Allhands was afflicted with certain minor physical ailments, and required such regular attention as assistance in walking, assistance with her daily bath, and daily enemas, and all these services and many others were willingly rendered by Mrs. Brewer. On March 21, 1927, 6 months before her death, Mrs. Allhands had a severe sinking spell from general weakness resulting in unconsciousness which lasted for several hours, and while she soon recovered, she was not able to move about after this illness as she had done before and required almost constant care and attention from Mrs. Brewer during the last 6 months of her life.

Soon after Mrs. Allhands died, Mrs. Montgomery and Mr. George R. Allhands had the United States

180

Trust Company appointed administrator of her estate, and the United States Trust Company, as administrator, together with Mrs. Montgomery and Mr. Allhands, brought this suit seeking the cancellation of the aforementioned writing on the grounds of mental incapacity and undue influence, and for an accounting by Mrs. Brewer of property conveyed to her by the instrument. When the issues were made up, the chancellor referred the following issues to a common pleas judge to be determined by a jury:

(a) Whether or not Mrs. Allhands, at the time the paper was executed, possessed mental capacity sufficient to enable her to dispose of her property according to a fixed purpose of her own?

(b) Whether or not she had mental capacity to contract?

(c) Whether or not Mrs. Brewer caused Mrs. Allhands to execute the instrument by the exercise of fraud or deception or duress or undue influence?

The first question submitted to them was answered "No" by ten out of twelve jurors. The second question submitted to them was answered "No" by eleven out of twelve jurors. The third question submitted to them was answered "Yes" by eleven out of twelve jurors.

The common pleas judge overruled the motion for a new trial, the case was returned to the chancellor, and, after argument before him, he entered the judgment stated. Under the evidence it is rather difficult to see why the jury answered "No" to the first two questions as there was no substantial evidence whatever of mental incapacity, but the jury's verdict was only advisory, and in his opinion the chancellor says:

"The case falls in the class where the burden is upon the donee to prove that the donor acted freely and of her own volition."

Hoeb v. Maschinot, 140 Ky. 330, 131 S. W. 23; Gross v. Courtley, 161 Ky. 152, 170 S. W. 600; Willoughby v. Reynolds, 182 Ky. 1, 205 S. W. 947; Gregg v. Hedges' Gdn., 227 Ky. 268, 12 S. W. (2d) 854.

"It is proved that the deceased was of a dominating disposition and was not usually controlled by others but rather controlled them. Defendant also introduced

a number of witnesses, friends of deceased, who testi-fied that she said to them that she wanted defendant to have all she had because she had been so good and had sacrificed her life to her. Some of these statements were made before and some after the deed of gift was made. If there were nothing more in the proof, this evidence would sustain the burden imposed upon defendant by the rule of law that has been stated.''

The chancellor then discusses certain traits of character of the defendant, certain scenes in which she was the principal actress, certain declarations she made, and from these concludes the defendant procured the execution of this paper by an undue influence over her mother. The usual rule in cases such as this cannot be better stated than it was in Mott v. Mott, 49 N. J. Eq. 192, 22 A. 997, 1000:

"With reference to transactions between parent and child, the law presumes that the influence of the parent over his child during the tender years of infancy is so controlling that it regards transfers from the child to the parent, on arriving at majority, or immediately thereafter, as having been made under the influence of overweening confidence. As the child matures and acquires experience and independence, the presumption weakens, and at last ceases. As the parent, however, advances in years, the condition of dependence may be reversed by the hand of time. If life draws to a close with a failing intelligence and enfeebled frame, the parent naturally looks with confidence to a son or daughter for advice and protection. The parent becomes the child, 'with the same dependence, overweening confidence and implicit acquiescence' which had made the other, in infancy, the willing instrument of the parent's desires.''

The facts here do not bring this case within that rule. Mrs. Allhands was not dependent on Mrs. Brewer, in the sense that she had to make her home with her, and, if Mrs. Brewer had refused to receive her, she would be at her wit's end to find a home. She had about $33,000 in United States Liberty bonds and other good securities, she could procure a home anywhere, she was independent and boasted of that independence and was determined to maintain it, she spoke of her

property as her business and often declared: "I will never part with my business so long as my head is hot."

She lived with Mrs. Brewer not as a matter of necessity but as a matter of choice. How much she paid Mrs. Brewer is not clearly shown. At first she paid $12.50 per month, but this sum was increased from time to time and at her death she was paying $50 per month. Mrs. Allhands did not fail in intelligence as she advanced in years and when she executed the paper in question she turned to Dr. Moren and he says that in the presence of him and the other witnesses this occurred:

"She turned around to me in her characteristic positive way, and pointed her finger at me, and she said, 'Now, doctor, I want you to know I am in my right mind, and know what I am doing; I hope I have done right.' There wasn't any question at all about the meaning as to what she said to me and the manner in which she said it."

The evidence shows Mrs. Allhands was a determined character and dominated those about her. It indicates she dealt with Mr. and Mrs. Brewer at arms length. Mr. Brewer wanted to borrow some money from her but she would not let him have it.

There was a letter written by Mrs. Montgomery put in as an avowal in which this appears:

"Mother has been set out more than once. When he and she demanded of her more board money and she refused them. She ate her 80th birthday dinner at a lunch counter in Louisville because of such a scene."

Mrs. Allhands was careful in her business matters constantly seeking to avoid costs or other expenses. In the testimony of Mrs. Montgomery this appears:

"She always said she hoped she would be in her right mind, so that when she was ill and on her death-bed she could have us there and divide the bonds between us, and then there would be no income tax or inheritance tax or court taxes."

Mrs. Allhands was a very large woman, for many years she was clumsy and had to have assistance in walking and in bathing. She had hemorrhoids and had

to have an enema daily to ease the pain of that afflic-
tion.  Mrs. Brewer rendered her these services.

Mrs. Brewer and Mrs. Montgomery were both
graduates of the medical department of Northwestern
University.  For a time they practiced their profession
together in Louisville, then Mrs. Montgomery married,
and Mrs. Brewer practiced alone for a while and later
abandoned her practice to care for her mother to whom
she was physician, nurse, bath attendant, traveling com-
panion, cook, and servant.  She was devoted to her
mother and referred to her as "My Baby."  Numer-
ous are the witnesses who testify to her kindness to
and care of her mother.  Even Mrs. Montgomery ad-
mits that.

Mrs. Allhands derived her estate from her husband
and from her son Dr. Edward O. Allhands who died in
1902.  Mrs. Brewer never would allow any one in her
presence to talk about the death of Mrs. Allhands or
the disposition of her property.  In the letter we men-
tioned above Mrs. Montgomery wrote this:

"Never in all these years since Eddie's & Pa's
death would she be present in any family talk or
listen to one thing said about it."

Whether the repugnance of Mrs. Brewer to the
discussion of her mother's death resulted from her filial
love, and the natural aversion to the thought of death
which we discussed in Pearson & Son v. Bonnie, 209
Ky. 307, 272 S. W. 375, 43 A. L. R. 1166, or was only
part of a plan by which she hoped to get her mother's
estate is the question.  The record shows many scenes
resulted from the mention of the matter and there were
three very ugly ones that occurred, one at Fairfield,
Mo., one at Danville, Ky., and one in the Gaston apart-
ments in Louisville, Ky.  On the occasion of the scenes
in Fairfield and in Danville, Mrs. Allhands and Mrs.
Brewer were visiting Mrs. Montgomery and the scenes
resulted in their leaving at once.  The scene in the Gas-
ton apartments occurred during a visit of Mrs. Mont-
gomery to Mrs. Brewer and Mrs. Allhands and resulted
in Mrs. Brewer's ordering Mrs. Montgomery out of her
house, but she refused to leave and stood her ground
for about thirty-six hours.

Mrs. Bessie Dunn testified she had been a friend
and frequent visitor of Mrs. Allhands for 25 years and

that in February, 1927, on one of these visits, Mrs. All-hands asked her if she would do her a favor and on being assured that she would that Mrs. Allhands said:

"When I approach Lillie on this subject, Lillie just goes all to pieces. She says she is very, very fond of you will you please use your influence and see if you can ask Lillie or help Lillie to become reconciled to my passing. * * * She said Lillie had lived a prisoner's life for years and years, and I am arranging some of my affairs right now; I want to arrange all of my affairs for Lillie; if you can, please use your influence towards Lillie and ask her to become more reconciled."

This and what we have copied above from the letter written by Mrs. Montgomery is possibly the key to the situation. Mrs. Brewer was so wholly devoted to her mother she could not with composure hear her dissolution discussed. Each of the ugly scenes in Fairfield, Mo., Danville, Ky., and in the Gaston apartments in Louisville, Ky., were brought about by talk of the death of Mrs. Allhands and how the business should then be divided. This is taken from the testimony of Mrs. Montgomery:

"Q. When you had these talks which would result in quarrels, you say that your sister would get mad? A. Very angry.

"Q. And what caused that anger? A. What was the reason for it? A. It was because she never wished to be present when mother would make a statement that would clinch matters.

"Q. Clinch matters as to what? A. As to the settlement of the money after she was gone."

Mrs. Allhands knew her daughters and according to the testimony of Mrs. J. B. Hardin, a woman 76 years old, who had known her for about 25 years, this was how she regarded them:

"Oh, she said, there is such a difference in Fannie and Lillie. Fannie is selfish, and Lillie is right the other way. Many times she told me that. The first time I met her daughter, Fannie there—after she went home, she told me that. It was, I reckon, a year and a half before she was sick."

This record looks like the old lady understood them

and that each of these scenes was brought about by an effort of Mrs. Montgomery to "clinch matters." Mrs. Montgomery testifies that money was the core of every "fuss." Mrs. Brewer appears to have a violent and waspish temper which she did not control, and when Mrs. Montgomery would endeavor to "clinch matters," Mrs. Brewer would fly into a fury and say and do many ugly things, for example Mrs. Montgomery and her daughters testify she said things like these: "I will see to that." "Don't worry!" "Just cut that all out. I will fix it and I will fix you too." "You will never get a cent of it, if I can prevent it." "I will see to it that I do get everything," etc. The appellees regard these as deliberately declared intentions of Mrs. Brewer to compel her mother to give her what she had, but they may be only angry outbursts, resulting from a righteous wrath aroused by the repeated discussion of her mother's dissolution.

The old lady knew her daughters and if her appraisement is correct, then it is natural Mrs. Brewer's uppermost thought would be, "How can I serve?" and Mrs. Montgomery's would be, "How can I clinch matters?" The record shows they did so think. Mrs. Hardin testified:

"I lived near them all my life. I am nearly seventy-six years old, and I never saw such devotion between mother and daughter, and Miss Lillie just —almost give up her life for her mother. She never left her alone no time. If she wanted to go out, I would stay with her mother while she was gone, and Miss Lillie never come in and went out, she did not go and kiss her mother."

Mrs. Houston who lived in the same apartment building testified:

"Mrs. Allhands told me—she was talking about Mrs. Brewer, what a wonderful child she had always been to her, how good and kind, and the attention that she had always given her, and she said—she said Lillie is sacrificing her life for me; she said I can never repay her. She said I want Lillie to have what little I have left, but she said even that will never repay her for what she did for me."

Mrs. Coffman testified:

"I could not see anything only that of devotion between the two. It was the most beautiful thing I have ever seen. I have often wondered if my daughter would ever be half so devoted to me as Lillie was to her mother and as Mrs. Allhands was to Lillie, because I have never seen anybody who has given up everything and did the sewing for Mrs. Allhands—she did that, even made her night gowns when she was ill. I just don't think I ever knew anybody who had given up everything in their whole life like Mrs. Brewer did to Mrs. Allhands."

Mrs. Norris testified:

"Mrs. Brewer was certainly wonderful. I have always admired her for her attention and love to her mother. No one could ever tell of how wonderful she was to her mother. She treated her like a queen. The mother never went out alone, and that is not only of late years, but ever since her mother lived with her. She has told me on several occasions that none of the rest of her children had ever offered her a home; that Lillie was the only one. She said to me, 'Oh, Emma, love Lillie and be kind to her,' she said 'For there never was a mother had another daughter as faithful and as good as I have had.'"

Space forbids the copying of other and similar evidence but the record is full of it, and full of statements that the old lady intended to give her what she had, and that it would not repay her for what she had done.

We have given above the oft-quoted expression of the New Jersey court regarding undue influence. As we stumble along from the cradle to the grave that is a correct statement of the law as applicable to the average individual, but that rule would not apply in extraordinary cases and this is an extraordinary case for Mrs. Allhands was an extraordinary woman. Old age does not always destroy capacity to make a will or to make a contract as we pointed out in Gambill's Adm'r v. Gambill, 236 Ky. 491, 33 S. W. (2d) 325. Age produces different results in different individuals. Feebleness of body does not always connote an enfeebled mind. Pope Leo XIII was 93 when he died, his body was so feeble he had to be carried for years, yet, he attended to his pontifical duties every day and in addition found time when past 90 to write quite a bit of Latin poetry.

After he was blind, Milton dictated Paradise Lost. Much of the writing of Robert Louis Stevenson was done while he was slowly dying of tuberculosis. U. S. Grant wrote his memoirs while suffering from a cancer. Beethoven wrote his finest music when he could not hear a sound. Alexander Pope was a helpless invalid, his life was just a long disease, yet we read and admire his writings. Witness after witness testify to the continued mental vigor of Mrs. Allhands, up to even the day before her death.

We believe the scenes described by Mrs. Montgomery and her daughters occurred just as they detailed them and that Mrs. Brewer in her rage said the things they testified she said, indeed Mrs. Brewer does not deny them, but the writing in question cannot be canceled because of them. They were at most mere threats on the part of Mrs. Brewer. There is no evidence she ever attempted to get her mother to do what she threatened she would do, on the contrary it shows Mrs. Brewer opposed her mother's doing anything that might bring up the thought of death. One witness who had known Mrs. Allhands for 25 years testified to a conversation with her about 2 years before her death:
"Mrs. Allhands said she wanted to make a deed

and Lillie would not let her. She said she ought to, because, she said, I know what I am talking about, and Lillie won't listen to me. I said Lillie thinks that would make you die sooner if you made a will. She said no, I want Lillie to have what I got left for she has deserved every cent of it and more, too. She give up her practice and her pleasures for me, where the others did not do that. She said if I do not make a will, there will be hell when I am gone."

Now let us study this situation briefly; this money belonged to Mrs. Allhands, with it she could do as she pleased. Upon the day she executed this instrument she had full mental vigor, she knew what she was doing, and did what she wanted to do.

As Mrs. Allhands lived with Mrs. Brewer, there is a presumption that Mrs. Brewer obtained the execution of this paper by the exercise of an undue influence over her mother. The question is, How strong is this presumption? Of course, there are circumstances under

which a donor, testator, or contractor could be so feeble mentally and the donee, devisee, or contractee so strong mentally and so actively present at the time of the execution of such a paper as to make the presumption of undue influence almost conclusive; but the presumption varies inversely with the mental vigor of the testator, donor, or contractor and there may be circumstances when this presumption would be so thin and nebulous as to be driven away by the first breath of evidence to the contrary, and this comes pretty close to getting to be such a case.

Some years ago, in Fairfield, Mo., at the time of that quarrel, in 1925 at Danville, Ky., at the time of that quarrel, and in 1927, at the time of the quarrel in the Gaston apartments, it is testified to by Mrs. Montgomery and her children that Mrs. Allhands expressed herself as feeling she should divide her estate among her children share and share alike, therefore they argue that this paper in question should be set aside because it is in conflict with the often expressed wishes of Mrs. Allhands. Now let us see if it is.

Doubtlessly Mrs. Allhands lived beyond that length of life she had expected. Certainly she lived far beyond the ordinary expectancy of human life and possibly she did come to think that she owed Mrs. Brewer this money to compensate her for the care, nursing, and attention which Mrs. Brewer had given her. She had perhaps come to regard what little she had as insufficient to pay what she owed to Mrs. Brewer, at least, she so told a large number of her friends and she so expressed herself in the paper that is before us, so we are not prepared to say that there is any evidence in this record that this paper makes a different disposition of the estate of Mrs. Allhands from what she had always intended to make.

Doubtlessly Mrs. Allhands would still have divided her estate share and share alike, if she had felt she had had an estate, but it is evident from this record that long before the execution of this paper Mrs. Allhands had concluded she had no estate and what she had she owed to Mrs. Brewer.

We are sure Mrs. Brewer had influence over Mrs. Allhands, but we are equally sure this influence was the result of the care, attention, and affection which this

record shows she lavished upon her. That alone is not undue influence. There is in this record no evidence of coercion, force, fear, fraud, or other things that might have destroyed the free agency of Mrs. Allhands and caused her, against her will, to do what she otherwise would not have done.

A careful study of this record forces on us the conclusion that Mrs. Allhands executed this paper freely and voluntarily for the reasons given in it and that she was in full mental vigor when she did it.

The judgment is reversed, the whole court sitting.