## Smith et al. v. Gilligan's Adm'r.

Jan. 27, 1939

**534**

WILLIAM ALPHA HUBBARD for appellants.

W. J. GOODWIN for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Reversing.

Anna B. Gilligan died a citizen and resident of Louisville, Kentucky, on the 21st day of March, 1936, at the age of about 80 years. She had previously resided at Watson, Indiana, where she was engaged in the mercantile business and also postmistress for approximately 40 years. In 1928 she sold her business and moved to Louisville and purchased a home and another house and lot. She lived alone most of the time until August, 1935,

at which time she became confined to her bed suffering from Bright's Disease and other complications. The appellant Mary E. Reddington, who was a second cousin of decedent, was employed to nurse her. The other appellant, Anne Reddington Smith, is a sister of Mary E. Reddington. These appellants were related to decedent through her mother and the only kin on her mother's side. She left no children or other lineal descendants. Anna Hines, Catherine Hines and Mary Klein claim to be related to decedent through her father, though there is some conflict in the evidence as to whether they were actually related by blood or by marriage only.

On September 5, 1935, Charles M. Gipperich, Trust Officer of the Liberty National Bank & Trust Company, was called to the home of decedent for the purpose of writing her will. There is apparent conflict in the evidence as to who called Mr. Gipperich to the home of decedent but it is fairly well established by Gipperich's evidence that Anne Reddington Smith called him. When he arrived at decedent's home and the making of the will was mentioned, the decedent said that she did not want to make a will or was not ready to make a will. According to the evidence of appellants, Mrs. Klein then engaged in an argument with decedent insisting that she make a will and that if she did not do so certain undesirable neighbors would get the house in which decedent lived which was built on what was formerly the back-end of the lot of Mrs. Klein's home, and that she, Mrs. Klein, would have to sell her property at an inadequate price or give it away because she would not live near the undesirable people referred to. On the other hand, Mrs. Klein insists that appellant Mrs. Smith insisted on decedent making the will. However, there was pressure brought to bear on decedent to make a will by one of the appellants or appellee, or perhaps both, and decedent then made her will. Under the will, after one or two small bequests were made, Mary Klein, Anna Hines and Catherine Hines were bequeathed the house in which decedent lived and appellants were bequeathed another house which decedent owned and the rest of her estate was divided equally between the five—the two appellants and Mary Klein, Anna and Catherine Hines.

According to the evidence of appellants, after Mr. Gipperich had written the will on September 5th, and had gone back to the bank, decedent said, "I wish Mary

Klein would mind her own business; I never wanted a will and if it had not been for her coming in here and fussing with me like she did I never would have made it." She then directed Mrs. Smith to call Mr. Gipperich to come back the next day, September 6th, which he did, and another will was written, at which time Mrs. Klein and appellants were present. That will is not in the record but it appears from the evidence that it was substantially the same as the former one, of September 5th, in that decedent again devised one house and lot to appellants and the other to Mary Klein and the Hines girls, and again directed that the remainder of her estate be equally divided among the five. As will be seen later, it appears that at the time decedent executed the last will she directed that the first will which had been taken to the bank by Mr. Gipperich be destroyed or returned to her. In any event, it appears that when decedent executed the last will, September 6th, she intended it to be her only will.

The decedent being physically unable to attend to her business, she executed to appellant Mrs. Smith a general power of attorney to transact her banking business. It appears that she was authorized to and did withdraw certain securities of decedent, sold them and deposited the cash to decedent's credit and perhaps made other withdrawals and redeposits, etc. However, these transactions are not in question except they are stressed by appellee as evidence of agency, confidential relations, etc., existing between decedent and appellants.

On or about Novmber 20, 1935, apparently at the direction of decedent, Mrs. Smith withdrew from the bank or decedent's deposit box $6,000 in cash and $4,000 in Government bonds and took them to decedent's home and delivered them to her. She kept this money and bonds there at her home until the evening of December 24, 1935, at which time in the presence of three people, other than appellants, the decedent stated that she knew she could not get well and that it would be her last Christmas on earth and she wanted to give away her property to those whom she wanted to have it while she was yet alive, because she did not want anyone fighting over it after she was gone. Decedent then reached under her pillow and took out an envelope containing $4,000 in bonds, handed $2,000 of same to Mrs. Smith and $2,000 to Miss Reddington, and $3,000 cash to each

of them. She told them that she was giving them everything she had and that she wanted them to have it. She advised them to take care of it and use it wisely and stated that she knew Mrs. Smith and Miss Reddington would take care of her as long as she lived. It appears that appellants retained possession of the property thus delivered to them and decedent never thereafter exercisd any control over it. It is virtually conceded that the above transaction constituted all elements of a gift inter vivos and passed title to the property, but for other reasons which we will later discuss.

On December 30th, or six days after the above alleged gift, decedent directed one of appellants to call William Alpha Hubbard, an attorney, to her house to write a codicil to her will. Mr. Hubbard responded to the call and took with him John H. Goranflo, a stenographer, and upon their arrival at decedent's home she told them in substance that she had made a will on September 5th, and on September 6th, had made another will, and that the will of September 5th had been destroyed; that she wanted to revoke the will of September 6th and that she had given away all her property except two pieces of real estate, a mortgage note and some household furniture; that she desired to give away everything she had while she was living to those who had been good to her so that people would not be fighting over it after she was gone. She further stated that the will of September 6th, which she said was at the Liberty Bank, was the only will in existence; that she had had Mr. Gipperich destroy the will of September 5th.

Thereupon Mr. Hubbard prepared for decedent the following writing:

"Codicil Revoking Last Will and Testament ⚏ ❋ ❋

"Know All Men by These Presents, that I, Anna B. Gilligan, a citizen and resident of Louisville, Jefferson County, Kentucky, residing at 131 South 38th Street, in said City, having heretofore, to-wit, on or about the 6th day of September, 1935, made and executed my last Will and Testament; that since said time I have by gift disposed of all of my property and I now hereby revoke and cancel said last will and testament which is now in the custody of the Liberty Bank and Trust Company.

"In Testimony Whereof I have hereunto set my hand at Louisville, Kentucky, on the 30th day of December, 1935, in the presence of W. A. Hubbard and John H. Goranflo, who have signed this Codicil in my presence as witnesses thereto and in the presence of each other, I having previously signed same in their presence and in the presence of each other.

"Anna B. Gilligan.

"Witnesses:
"W. A. Hubbard
"John H. Goranflo."

At the same time decedent directed Mr. Hubbard to prepare deeds for her conveying to Mary Klein and the two Hines girls the house and lot in which she lived, and also deeds to appellants to another house and lot which she owned on Eliot Avenue. Also at the request of decedent, a bill of sale was drawn to appellants for decedent's household furniture and some personal property in her home. She also requested Mr. Hubbard to draw an assignment of a mortgage note for $500 secured by property at Watson, Indiana. Mr. Hubbard advised her that since the property was in Indiana and she did not have a copy of the note or mortgage on hand, to get her Jeffersonville (Indiana) lawyer to prepare the assignment, which was later done.

After decedent's death her will executed September 5, 1935, was found at the Liberty National Bank & Trust Company, which was produced in probate court and also the codicil or writing revoking the will of September 6th was produced and both were admitted to probate.

Edward E. Langan, appellee, was appointed administrator with the will annexed of the estate of decedent, and brought this suit against appellants seeking to recover of them the sum of $30,000 which it was alleged they had secured from decedent before her death. However, the proof shows that they only obtained $10,000 in Government bonds and cash as we have indicated above, and the assignment of the $500 mortgage. For his cause of action, plaintiff, administrator, alleged mental incapacity of decedent, and fraud and undue influence on the part of appellants.

The answer consisted of a traverse only and with the issues thus made the case was referred to Charles T.

Ray, Commissioner of the Jefferson circuit court, to hear proof and report his findings and recommendations to the chancellor. The Commissioner took proof and made his report stating that as a matter of fact the preponderance of the evidence tends to show that decedent was mentally capable of disposing of her property and further found that the proof failed to establish any undue influence, fraud, or other wrong conduct upon the part of appellants; that on the issue of undue influence the proof showed nothing more than a mere opportunity of appellants to exercise undue influence but failed to show any coercion, act or conduct on their part amounting to undue influence and that mere opportunity alone in the absence of some evidence that undue influence was exercised by appellant was insufficient, and recommended that plaintiff's petition be dismissed.

Appellee filed exceptions to the Commissioner's report and upon a review of the record the chancellor sustained the exceptions and entered judgment requiring appellants to return to appellee the property they had received from decedent. This appeal follows.

Since the transaction of December 24, 1935, relating to the alleged gift of the $10,000 in cash and Government bonds to appellants was sufficient to constitute an inter vivos gift, the questions to be determined are whether decedent was mentally capable of disposing of her property, and whether there was undue influence exercised by appellants in the obtention of the property, all of which must be determined from the evidence. We will first review the evidence produced on behalf of the plaintiffs.

Anna C. Bates, a nurse, testified at length as to the condition of the decedent when she first became ill in the summer of 1935. She described her physical condition as being very weak, but her evidence discloses nothing indicating mental incapacity. It appears that she had not seen decedent in the interval between October 1935 and about five weeks prior to her death. She said she did not see decedent just before Christmas or about the time of the alleged gift and the revocation of the will. When she saw decedent after Christmas or about five weeks before her death, she said she appeared weak and would talk about things that happened a number of years ago and talked "flighty." She was asked if decedent talked intelligently, was at herself and nor-

mal, and her answer was, "Yes, she seemed to be normal."

Miss Anna Hines testified that upon various occasion when she saw decedent during her last illness, she was in bed, very weak and apparently more feeble each succeeding time. She said she saw decedent in December, 1935, and she seemed to be weak but upon being asked about her mental condition at that time she answered, "She seemed to be very well.

"Q. Mentally? A. Yes.

"Q. How did she talk, could she carry on a conversation or not? A. She would talk to me just like anybody else would, she seemed to talk very well from all I could understand from her."

Catherine Hines testified that decedent grew progressively weaker and two months before she died she could not collect her thoughts, talked about things "way off" and would get off the subject. She was asked:

"Up to the first of February she was alright, just as good as she was in September (1935)? A. Yes, I think so.

"Q. Up to the first of February she talked just as rational and her thoughts were just as connected as they were in September when the will was written? A. Yes."

Mary Klein testified that two weeks before decedent's death decedent started crying when she, witness, went in. "Q. What condition was she in, that is, from what you yourself could see? A. I thought she was in very good condition."

Dr. Hauss, decedent's physician who treated her up to the time of her death, was also called as a witness for plaintiff. He was asked if he observed the relations between decedent and appellants with respect to whether decedent seemed to be fond of and devoted to them, and he said he had every reason to believe that she felt very kindly toward them and that they treated decedent perfectly, and in response to questions he said he never did see them at any time undertake to exercise any undue influence over decedent. He was further asked and answered as follows:

"Q. I want to ask you whether or not on the 24th day of December, 1935, Christmas Eve,

whether or not at that time Mrs. Gilligan was a person, in your opinion as a physician, capable of knowing the nature and character of her estate, making a rational survey of it, knowing who the objects of her bounty were and disposing of her property according to a fixed purpose of her own.  A. I don't think there ever was a time that Mrs. Gilligan had anything like mental aberration.  I think really her mentality at all times was very remarkable.

"Q. You are of the opinion then that she did have mentality enough Christmas Eve and at that time in 1935, to dispose of her property the way she wanted it to go?  A. I think she did.

"Q. Was her mentality apparently as good at that time as it was in September, 1935?  A. I really could not notice any difference.

"Q. Was her will power just as strong at Christmas time in 1935 as it was in September and at all times during her illness?  A. Well, I could not say as to that, of course; but naturally when a person is physically exhausted, they are influenced mentally in a degree, but at the same time, as I said before, I do not think there was ever anything like a definite mental aberration; I think she was mentally capable of doing that which she desired to do.

"Q. I want to ask you if that strong mentality and strong will power did not keep up almost to the time of her death.

\* \* \* \* \* \*

"A. Well, I will say that there certainly was not any deviation from the normal; I never did find her erratic, or never witnessed anything that would indicate deterioration along that line."

Dr. Hauss further testified that decedent's disease (Bright's Disease) disabled her physically but it had no effect upon her mentally.  Dr. Solomon testified that very often Bright's Disease did not impair some people's mentality.

For accuracy and a clear understanding of Dr. Hauss' testimony on the crucial points we here quote from his evidence as follows:

"Q. Now, Doctor Hauss, I want you to tell the

Court just what character of woman she was, whether she was a person of strong mentality and positive character or otherwise. A. She was very much so.

"Q. Very strong character? A. Yes.

"Q. Did that continue up until her last days? A. I never noticed any marked change as far as her mentality was concerned.

"Q. What about her will power? A. She always was a woman of strong will power.

"Q. I want to show you a photostatic copy of a given appointment given by Mrs. Gilligan on November 20, 1935, to Mrs. Ann R. Smith, witnessed by you and Mary E. Reddington, to enter her box in the Liberty Bank & Trust Company, and ask you whether or not that is your signature on there as a witness? A. Yes it is.

"Q. I want to ask you whether or not at that time Mrs. Gilligan was a person of sound mind and knew what she was doing? A. Yes.

"Q. On November 20, 1935? A. Yes.

"Q. I want you to tell the Court who waited upon and looked after Mrs. Gilligan in her last illness. A. Miss Reddington.

"Q. I want you to tell the Court whether or not you ever talked to Mrs. Gilligan during her last illness, and whether or not she ever told you what she wanted to do with her property. A. At the time that she spoke to me about this, she made a statement to the effect that she was unable to attend to her personal affairs, and at that time I had a son that has been with the Liberty Bank and Trust Company for many years, and it seems as if she had placed her affairs in their charge, and she asked me one day if I thought the Liberty Bank & Trust Company was all right, as she expressed it; I told her I felt quite sure that it was; that I was very certain my son would have given me at least an intimation if it was not. I assured her I thought she could rest easy on that proposition. Then she made a statement to the effect as she was unable to look after her business affairs, she wanted to know if I

would witness the card to the effect that Mrs. Smith would do that for her.

"Q. That is the card here on Nov. 20, 1935? A. Yes.

"Q. She knew at that time what she was doing and did she do it voluntarily? A. Yes; there was no one in the room at that time.

"Q. I want to ask you whether or not she told you whom she wanted to have her property after she was dead, what she wanted to do with it. A. Mrs. Gilligan did not discuss her financial affairs with me, although as I have said we were intimately associated, but she did say that Mrs. Smith and Miss Reddington had been very kind to her and she wanted those that cared for her to be her beneficiaries.

"Q. Was there any one present in the room at the time she told you that? A. No.

"Q. Can you place that date, about when it was? A. I think it was, if I am not mistaken, the same time she asked me to sign the card.

"Q. You said, as I understood it, that she wanted Miss Reddington and Mrs. Smith to be her beneficiaries, is that right? A. She expressed it this way, that Mrs. Smith and Miss Reddington had been very kind to her, and she wanted those that had taken care of her to be her beneficiaries.

"Q. Had anybody been taking care of her during that last illness except Mrs. Smith and Miss Reddington that you know of?

\*    \*    \*    \*    \*    \*

"A. Not that I know of."

Dr. Simrall Anderson was called as a witness for plaintiff and asked a hypothetical question embracing the history and physical condition of decedent and asked to give his opinion as to her mental and physical condition, and in his answer, after detailing the usual symptoms and effects such disease had upon people of decedent's age, he said that usually they are easily influenced, and gave it as his opinion that decedent was influenced, and that she had mental impairment.

But it must not be overlooked that Dr. Anderson

based his opinion upon a hypothetical question without ever having treated decedent or personally observing her either before or after her illness. If it be conceded that Dr. Anderson's opinion would be correct in a number of cases described in the hypothetical question, it does not follow necessarily that it is true in all cases or as to each individual. He did not undertake to say that there were no exceptions to the rule. With all due credit and respect to Dr. Anderson's judgment, we do not think that his evidence is entitled to any great weight in the present case, as against the evidence of Dr. Hauss, who had personally known and observed decedent for a number of years and treated her from the beginning of her illness to the time of her death. It is common knowledge among laymen, as well as physicians, that the same disease, general physical conditions and age, do not always have the same effect on different people's mental condition, hence, each case must be determined upon its particular facts.

Dr. H. C. T. Richmond was called as a witness for the appellants, defendants below, and testified that he saw decedent twice after December 24th, the time the inter vivos gift was made. The first time was March 13th, eight days before she died, and again, on March 18th, three days before she died. The substance of his testimony is that decedent was of normal intelligence and he gave it as his opinion as a physician that on March 18th, she was capable of knowing the nature and character of her estate, the objects of her bounty, her duty toward them and make a rational disposition of her property according to a fixed purpose of her own. He said that the general rule is that Bright's Disease does not affect a person's mentality.

The appellants, Mrs. Smith and Miss Reddington, who had been called as witnesses for the plaintiff and examined at length concerning the transactions with the decedent, were called as witnesses in their own behalf. No objections appear in the record to their testimony, since appellee had introduced them as witnesses in his behalf they were made competent witnesses in their own behalf. Also the three other witnesses, Mrs. Thompson, Miss Dolan and Mr. Doughten, who were present on December 24th, when the gifts were made, testified as to what happened. Without incumbering this opinion by detailing or quoting their evidence, it is sufficient to say

that the evidence of the appellants and these other three witnesses was favorable to appellants and nothing was developed by their testimony indicating any wrongdoing on the part of appellants. Mr. Hubbard and the stenographer, John H. Goranflo, who prepared the writing of December 30, 1935, revoking decedent's will of September 6th, also testified and, according to their testimony, decedent was of sound mind and capable of disposing of her property at the time the gifts were made. Mr. Goranflo stated that decedent told Mr. Hubbard what she wanted put in the codicil or writing revoking the will and Mr. Hubbard dictated it to him, Goranflo, in the presence of decedent, and before Goranflo wrote it he read it over to decedent and asked her if that was correct and was what she wanted in the codicil, and she said it was. Goranflo further stated that decedent said she had made a will on the 5th, but the witness did not remember the month, "but she made a will on the 5th, whatever month that was, I remember it was on the 5th and that she had called the Liberty Bank & Trust Company, I cannot remember that gentleman's name up there.

"Q. I will ask you if it was Mr. Gipperich? A. Right, and asked him to come down there, that she wanted, I may be wrong, I don't know whether she asked him to come down or destroy the will, that she wanted to make another will, and there was another will made on the 6th, which she had in the house, at the time to which this codicil was written revoking that will, and she also stated that they had advised her that the will had been destroyed, that is, the will of the 5th."

He further stated that decedent said she wanted to dispose of her property before her death so they could not all fight over it after she was dead. He also testified concerning the deeds that were prepared conveying the real estate to appellants and Mary Klein and the Hines girls. He said that no one suggested anything to decedent, and that she was only asked what she wanted done and she told them and after he had written up the codicil, deeds, etc., he read them over to her and she signed them without any suggestions from anyone. He said it appeared that she was "studying what she wanted to do without any coercion on anybody's part, because she was very determined." He was asked

what, if anything, decedent said about Mary Klein and the Hines girls, in reference to making them a deed to the property she deeded to them, and his answer was, "She said they were related to her only by marriage and they had been awfully good to her and she wanted to leave them this property."

In regard to the assignment of the $500 mortgage on the property in Indiana, James L. Botteroff, attorney of Jeffersonville (Indiana), who drew the assignment of the mortgage, testified that Mrs. Smith told him that it was for the purpose of collection, but on cross-examination he finally said that was his best recollection about the matter. Mrs. Smith denies making that statement. However, it may be conceded that the evidence pertaining to this transaction standing alone is somewhat meager, but once it is considered in the light of other transactions and facts it is more plausible. According to the undisputed evidence of a number of witnesses, decedent said on December 24th, at the time of the alleged gift, and again on December 30th, at the time she executed the writing revoking the will of September 6th, that she had disposed of all her property by gift, without making any reservation of the mortgage or other item of property. It would be unreasonable to believe that decedent intended to dispose of her property as she did by giving to appellants all her cash and bonds and household goods and deeding to appellants and others mentioned all her real estate and then reserve the $500 mortgage and make an assignment of it for the purpose of collection for her own benefit. We think that the assignment of the mortgage comes within the same category as the gifts of the other property.

However, there is considerable evidence to the effect that one of the Hines girls lived with decedent in Indiana, worked for and assisted her in her business and also frequently visited her and helped wait on her during her last illness. These facts are urged as evidence that it was decedent's natural inclination to make an equal division of her property between appellants, the Hines girls and Mary Klein, as indicated in her wills. But it is not unusual for people to change their minds in the disposition of their property, and revoke and modify their wills. Such changes are not of themselves evidence of either undue influence, nor mental incapacity. It appears that decedent recognized the kindness

of the Hines girls and Mary Klein by deeding to them her home and stated as a reason that they had been good to her and she wanted them to have the property, but recognized them as being related to her only by marriage.

We are not unmindful of the rule that gifts made under the circumstances like or similar to those disclosed in the present case will be zealously scrutinized by the court and the burden is upon the donee to show that the gifts were voluntary acts of the donor and free from undue influence, coercion or other wrong on the part of the donee. McGill's Adm'r v. Richards, 12 Ky. Law Rep. 717; Carrington's Ex'r v. Fogg, 7 Ky. Law Rep. 596.

The question is: Have appellants, donees, sustained that burden?

Aside from the opinion evidence of Dr. Anderson, a stranger to decedent, based upon the hypothetical question, the only evidence produced by plaintiffs is that decedent at times seemed to be "flighty" and rather incoherent in her conversation—change from one subject to another, etc., and this was in February, 1936, after the alleged gift and the revocation of the will which occurred December 24, and December 30, 1935, respectively.

In Dixon v. Dixon et al., 236 Ky. 608, 33 S. W. (2d) 611, wherein a similar question was involved, this court said [page 613]:

> "Inability to name all of one's relatives, the habit of changing from one subject to another, and occasional forgetfulness, are so common to all of us that, considered singly or altogether, they offer a very unsubstantial basis that one of whom these things are said is incompetent to make a deed."

In the case of Brewer v. Allhands' Adm'r, 251 Ky. 178, 64 S. W. (2d) 469, which is also virtually in point with the present case, Mrs. Brewer, Mrs. Allhands' daughter, lived with her. It appears that Mrs. Allhands before her death had given her daughter certain cash and bonds and the administrator brought suit to recover of Mrs. Brewer this property. The case was tried to a jury and the jury decided that Mrs. Allhands did not have mental capacity sufficient to enable her to dispose of her property, and that Mrs. Brewer had practiced

fraud and deceit upon her. Upon appeal to this court the verdict of the jury was set aside and it was held that Mrs. Brewer was entitled to the property Mrs. Allhands had given her. In discussing the fact that Mrs. Brewer lived with Mrs. Allhands and had an opportunity to exercise undue influence, and that the burden was thus placed upon Mrs. Brewer to show that the gift was a valid one and not obtained by undue influence or other wrong, we said [page 473]:

"Of course, there are circumstances under which a donor, testator or contractor could be so feeble mentally and the donee, devisee, or contractee so strong mentally and so actively present at the time of the execution of such a paper as to make the presumption of undue influence almost conclusive; but the presumption varies inversely with the mental vigor of the testator, donor, or contractor and there may be circumstances when this presumption would be so thin and nebulous as to be driven away by the first breath of evidence to the contrary * * * ;"

It appears to us that the present case comes within the category of the cases supra, and many other like and similar cases which might be cited, and that appellants have sustained the burden placed upon them by reason of the facts and circumstances which existed at the time of and previous to making of the gifts and disposition of decedent's property by her on December 24 and December 30, 1935, respectively.

Coming to the question of undue influence we find no evidence of any witness that appellants actually exercised any undue influence over decedent, unless undue influence be presumed from the circumstances and the fact that decedent was old and in bad physical condition, and appellants lived with her and had an opportunity to exercise undue influence. But it is the settled rule that when a donor, testator, or grantor is shown to be mentally competent to dispose of his property and nothing more is shown than that the beneficiaries had a mere opportunity to exercise influence, such influence will not be presumed because of age or physical infirmities. In such circumstances there must be evidence of a substantive and probative nature tending to show that the beneficiaries actually exercised undue influence. It would indeed be a dangerous doctrine to hold that the fact that a child or other relative lived with, nursed

and cared for his aged and infirmed parents, or other relatives, would deprive such person of any donation or gift or other reward without any evidence of a substantial nature that such donee exercised undue influence or other unlawful conduct.

In Smith v. Smith, 243 Ky. 240, 47 S. W. (2d) 1036, it is said [page 1040]:

"Coming to the question of undue influence, it must not be overlooked that mere opportunity for undue influence is not sufficient. It must appear that such influence was exercised. Stutiville's Ex'rs v. Wheeler, 187 Ky. 361, 219 S. W. 411. It must also be remembered that influence obtained by modest persuasion and argument addressed to the understanding or mere appeals to the affection is not undue influence in a legal sense. * * * Aside from this, mere inequality in the disposition of one's estate between his direct descendants is not of itself sufficient evidence of undue influence, Gay v. Gay, 183 Ky. [238] 243. 209 S. W. 11, and there is every reason why the rule should apply with equal, if not greater, force to collateral relatives."

In this connection we may note that it is not disputed that appellants are blood relatives of decedent, while the preponderance of the evidence tends to show that Mrs. Klein and the Hines girls are related to decedent only by marriage. They testified that they were related to decedent by blood, but upon attempting to connect that relationship they were somewhat indefinite as to certain ancestors. We have also the undisputed evidence of the witness, Goranflo, that decedent, when conveying to Mrs. Klein and the Hines girls a parcel of her real estate, stated that they were related to her only by marriage. Her evidence, taken in connection with the rather indefinite evidence of appellees on the question of relationship, pretty well establishes the fact that appellees were related to decedent by marriage only. Then on the question of inequality of division of decedent's property, it is thus seen that it would not be unnatural for her to want her blood kin to have more of it than those related by marriage only.

In view of all the evidence on both issues—mental capacity and undue influence—we are constrained to the conclusion that decedent was mentally competent to

dispose of her property and appellants have sustained the burden put upon them to show that the gifts and disposition of decedent's property were free from undue influence or other wrong-doing on their part.

For the reasons stated, the judgment is reversed and remanded for proceedings consistent with this opinion.