## McCarty et al. v. Conley et al.

Dec. 19, 1941.

John J. Winn and J. A. Richards for appellants.

W. C. Hamilton for appellees.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

Prior to the 25th day of April, 1940, Perry McCarty was the owner of two tracts of land in Bath county, Kentucky. One tract contained sixty acres and was known as the "home place" and the other tract contained seventy acres and was located across the road from the sixty acre tract. On April 25, 1940, Perry McCarty conveyed the seventy-acre tract to his son, Walter McCarty, who is the appellant in this appeal. Perry McCarty died on the 28th day of June, 1940, leaving surviving him Walter McCarty and three married daughters and also a number of grandchildren, who are the children of two deceased daughters who had predeceased the decedent, Perry McCarty. Soon after the death of the decedent the three daughters and the children of the deceased daughters brought this action in the Bath circuit court

seeking a cancellation of the deed referred to above, upon the grounds of mental incapacity and undue influence.

It is alleged in the petition, in substance, that for more than a year prior to the execution of the deed decedent had been a "physical sufferer," practically an invalid, spent a large portion of his time in bed or in a hospital, and had been under personal care; that he was 76 years of age and because of his physical ailments and advanced age he had been for the past year, and was on the 25th day of April, 1940, feeble in mind and body and without mental capacity sufficient to know his property, the objects of his bounty, and was incapable of disposing of his property according to a fixed notion or purpose of his own, and had no understanding of property values or knowledge to direct him in any business transaction and was therefore unable to deal at arm's length with another in any contractual way or know the nature, purport or effect of a contract or deed, and did not have mental capacity sufficient to enable him to make a deed of conveyance of his property. Other allegations are made to the effect that because of decedent's condition the appellant, Walter McCarty, influenced and persuaded decedent to execute to him the deed in question without paying a valuable or other consideration therefor. Other allegations of undue influence are made, followed by the allegation that but for the undue influence and wrongful acts on the part of appellant decedent would not have executed said deed.

Appellant filed his answer in which he admitted that for more than a year prior to the 25th day of April, 1940, the decedent had been a "physical sufferer," but denied all other material allegations of the petition, thus completing the issues. The evidence was taken by deposition and upon trial of the case the chancellor rendered judgment cancelling and setting aside the deed. This appeal follows.

The sole ground urged for a reversal of the judgment is that it is not supported by sufficient evidence. Hence, a review of the evidence, including the surrounding facts and circumstances under which the deed was executed, becomes necessary.

It appears that in June, 1939, the decedent underwent a surgical operation of the prostate gland which apparently had developed a malignant or cancerous con-

dition. He remained in the hospital about one month and was then removed to his home where he remained with his wife until her death, which occurred in March, 1940. After the death of his wife he went to the home of his daughter, Mrs. Lizzie Conley, and lived in her home until April 9, 1940, and then went to the home of appellant and was living there with him on April 25, 1940, at the time the deed was executed.

Mrs. Conley testified as to decedent's condition while he was living in her home during the latter part of March, 1940, and up to April 9. She was asked about decedent's condition of mind and body and she said he was ''in a mighty weak condition,'' and physically unable to take care of himself. She further said:

> ''We gave him his bath and put on his clothes, and when he would sit on the bed we would have to put his feet on the bed and when he went to get up we would have to help him.''

In speaking of decedent's mental condition she only said, ''at times he was childish'' and that his mental condition was ''weakened.'' She said she saw decedent only once between April 9 and April 25 when she visited him at the home of appellant on the 21st day of April. The witness further testified that for several years appellant had wanted decedent to give him forty acres of land but that she knew nothing about the deed in question until after the death of decedent when she went to the courthouse to see if decedent had left a will and the clerk then told her about the deed which had been recorded. She further said that she saw decedent about two weeks before his death, which was about six weeks after the deed had been executed, and in speaking of his condition she said ''He just knew me and that was all.''

Mrs. Liza Hovermale, another daughter of decedent, gave her deposition which appears to be about the same in substance as that of the preceding witness in reference to decedent's physical and mental condition from the time of his operation in June 1939, until his death about one year later. The witness further testified that she was frequently with her father, the decedent, when appellant was present, and that her father would do anything that appellant asked him to do at the time she was with them. She further said that she did not learn that the deed in question had been made until her brother-in-

law, George Goodpaster, told her about it and she then asked appellant if such deed had been made and he admitted that it had. She was asked and answered these questions:

"Q. Did he say why? A. He said he thought he would have made it to him before that if my stepmother had been agreeable. Walter said he was going to try to get him to 'Deed me the forty acres or he can deed me the whole place and if anything happens to him I will see that you all get your share.'

"Q. About when was it that he made that statement? A. About a week after he went up to Walter's. I can't say the date."

The above evidence is undenied by appellant or any other witness so far as the record discloses. On cross-examination the same witness was asked and answered these questions:

"Q. Just prior to the time this deed was made what was his condition? A. He was just awful sick.

"Q. He was sick in what way? A. He was just very nearly helpless. He just lay around wherever he went. * * *

"Q. What was his mental condition? A. He was just sick and humble and helpless.

"Q. Was he able to express to you, upon these occasions, was he able to express to you in language that you could readily understand his thoughts and purposes and desires? A. A lot of times he would start to tell me something and get a part of it told and then stop and start crying.

"Q. When was that? A. Maybe six weeks before he died.

"Q. The six weeks just prior to his death? A. It was that long I know.

"Q. You don't know what his condition was at the time this deed was made? A. He had to be helped up and down.

"Q. I am speaking of his mental condition? A. He was humble as a baby.

"Q. That was one of his characteristics wasn't

it. Wasn't he—he was always of that disposition? You recognized that throughout his life? A. Yes but more than before.

"Q. It was his trait to be humble and childish? A. No not childish but in the last year. I would say; since he was operated on."

Another witness testified that during the last few months of decedent's life he had the "mind of a child." Mrs. Goodpaster, a daughter of decedent, testified on direct examination that about the 15th of May, 1940, or about three weeks after the deed was executed, she visited her father and he was "bed-fast" and seemed to be in serious condition. She further testified that decedent called for some papers which apparently he wanted to destroy. On cross-examination counsel for appellant asked the witness to state exactly what her father told her about the papers, and she answered:

"He called me. I was in the other room and I said 'I am coming, Dad,' and just as I came in he said 'Get me those papers up there,' and he was looking toward the mantel. They were laying back of the clock and I said 'All right. Do you want those Sunday School papers?' He said 'Dick and Walter have pestered me to death.' He used a slang word. It meant the same. He said 'to sign those papers' he said 'Bring them to me.' He said 'I didn't want to do it' and he started stammering and I said 'It don't matter. You can tell me another time.' Anna was standing there at the foot of the bed and he said 'Anna can tell you' and she turned around and started dusting around and I said 'Anna what does he want to tell me.' She said she didn't know."

A number of other witnesses testified as to their observations of decedent's physical and mental condition and their evidence appears to be along the same line, or in substance the same, as that of other witnesses as indicated above.

The substance of appellant's testimony is that decedent was in normal mental condition previous to and at the time of the execution of the deed, and in fact, up to his death. He admitted, however, that decedent's physical condition was bad just previous to his death but denied that it was such as indicated by the other witnesses previous to and immediately after the execution of the

deed. A number of other witnesses introduced in behalf of appellant gave testimony favorable to him. It would appear from their evidence that decedent was in sound mind although his physical condition was bad. Dr. Robert G. Hunter testified for appellant and stated that decedent's mental condition was good at the time the deed was executed. The evidence is conflicting as to the condition of decedent's mind.

We have only stated briefly the testimony of the witnesses bearing on the question of decedent's mental and physical condition. There are other important facts and evidence relating to the preparation and procurement of the deed and other events in connection therewith, all of which are set out in a memorandum opinion written by the chancellor and filed with the record which we here set out in part and adopt the same as the opinion of this court, to wit:

"At the outset of this case I am confronted with the fact that at the time this deed was made the deceased, Perry McCarty, was living with his son, the defendant Walter McCarty, and was old and infirm in health and that all the preparations for the execution of the deed were made by Walter McCarty. The proof shows that Walter McCarty went to Owingsville and had the deed there written by an attorney Harold Swartz and paid that attorney for writing the deed and then brought the attorney, who was also a Notary Public, to his home and there Perry McCarty, while lying down on the couch executed the deed. In view of these circumstances I am constrained to the opinion that the basic rule governing this Court in determining the validity of the deed in question, may be found in the case of Brewer vs. Allhands' Administrator, 251 Ky. 178, 64 S. W. (2d) 469, 470, which is as follows:

" 'With reference to transactions between parent and child, the law presumes that the influence of the parent over his child during the tender years of infancy is so controlling that it regards transfers from the child to the parent, on arriving at majority, or immediately thereafter, as having been made under the influence of overweening confidence. As the child matures and acquires experience and independence, the presumption weakens, and at last ceases. As the parent, however, advances in years,

the condition of dependence may be reversed by the hand of time. If life draws to a close with a failing intelligence and enfeebled frame, the parent naturally looks with confidence to a son or daughter for advice and protection. The parent becomes the child, ''with the same dependence, overweening confidence and implicit acquiescence'' which had made the other, in infancy, the willing instrument of the parent's desires.'

''It is shown by the proof that the decedent had lived with his son Walter McCarty, some years on the home place of the decedent and that some two or more years before the deed was made he may have expressed some intention to deed Walter McCarty some land, but this intention seems to have been limited to the conveyance of forty acres, whereas the deed in question contains seventy acres; but this intention was expressed at a time when there would have been no doubt as to the capacity of the deceased to make a deed, and the fact that he did not do so when he had such capacity militates against the notion that he ever had any fixed intention so to do.

''That the decedent was enfeebled in body is beyond question, and I am further convinced from the proof that his age and feebleness of body had also enfeebled his mind to such an extent that he was unable to withstand the desires of his son Walter, and it will be remembered that he moved to the home of Walter McCarty on April 9, 1940, and that on April 25, of that same year, he made the deed in question. At the time he made the deed it had been prepared solely upon the direction of Walter McCarty, and the circumstances surrounding its execution, and especially the meager part that the decedent played in the execution of that deed, merely marking his name, are such as to convince me that this deed was not really his act and deed.

''It is probably not important the fact that the attorney Swartz signed the name 'Perry Trailor' to the deed aforesaid instead of Perry McCarty, but that circumstance may be taken into consideration, and it will be noted in that connection that the witness Swartz stated that at the time Perry McCarty made his mark he was a very sick man. It may be further noticed that the consideration stated in the

deed is $1.00 and other valuable considerations, the receipt of all of which is acknowledged. In the granting clause where the word 'sell' usually appears, we find the word 'give.' We have, therefore the fact that although the defendant, Walter McCarty, was having the deed prepared according to his own notion and caused the deed to set forth not only a pecuniary consideration but also that the deed might be construed as a gift. Of course both of these conditions did not exist, and it is my opinion that had Perry McCarty been fully able to understand this deed he would have taken some steps to rectify the conflict. There was some proof in the case from Walter McCarty that there was a pecuniary consideration, but as Walter McCarty was the only witness to that fact and his testimony was incompetent, it can not be considered.

"It is argued that since the decedent on April 2, 1940, executed a mortgage to the Farmers Bank of Owingsville to secure a loan for $600.00 to pay his debts that that shows he was competent to make the deed in question. There is no question but that that mortgage was fairly made and that the decedent received full consideration, and it is really not important as to whether or not he was competent to make the mortgage, because having gotten the money in any event his estate would be required to restore that money before the mortgage would be effective. It may be further noticed that this $600.00 mortgage was made upon the seventy-acre tract of land in question as well as the sixty-acre tract owned by the decedent. It is hard to understand that if at that time the decedent intended to convey the seventy-acre tract to his son Walter McCarty, he would not have mortgaged this tract to secure the six-hundred debt, and there would appear to be no good reason to include the seventy-acre tract of land in the mortgage because the sixty-acre tract was worth at least three times as much as the amount of the mortgage. And it may further be noted that at the time of the execution of the mortgage the decedent then lived with his daughter, Mrs. Conley, and had not actually come under the control and domination of the defendant, Walter McCarty.

"I have not overlooked the fact that the only

professional witness in the case, Dr. Hunter, testified that the decedent at the time he made this deed was of sound mind. I do not understand the soundness of mind is conclusive of questions similar to the one under consideration. The decedent certainly had an enfeebled mind and one that in all probability could not withstand the importunities of the one in whose custody he was, and there is proof in the record to show that these importunities were at hand. There is also proof in the case that after this deed was executed the decedent referred to some papers that he wanted to destroy. He asked for these papers, and insofar as this record shows the only paper or papers that he could have been referring to was this deed.

"The defendant, Walter McCarty, lived with his family upon the home place of the decedent for many years, and it is not hard to conclude from the circumstances in this case that the obligations were from son to the father rather than from the father to the son.

"I realize that one had the right to do with his property as he pleases and may prefer, in the distribution of same, one over another, but such preferences either by will or deed must be the undoubted preference of the testator or grantor and under such circumstances as would fairly demonstrate a real preference. The deed in question was prepared in the absence of the deceased and under the direction of the defendant, Walter McCarty, by a lawyer selected by Walter McCarty and was executed at the home of the defendant Walter McCarty, and in his presence and at a time when the deceased was enfeebled in mind and body and was in the custody and under the control of the defendant Walter McCarty. It was incumbent under these circumstances upon the defendant, Walter McCarty to show that the execution of this deed was the free and voluntary act of the deceased. I am convinced upon consideration of all the facts and circumstances shown in this record that the defendant has failed to assume this burden or establish his case."

It appears from the chancellor's opinion that the judgment rendered was based upon undue influence, rather than mental incapacity or insanity in the usual

meaning of those terms. We do not think the evidence is sufficient to show that decedent was insane but there is evidence of a probative nature tending to show a weakened mental condition, or at the least, a condition that might render him susceptible to undue influence. We recognize the rule that mere opportunity alone for undue influence does not constitute evidence that undue influence was actually exercised. We think that in view of the circumstances and manner by which the procurement and execution of the deed in question was brought about, as stated in the opinion of the chancellor and detailed by the evidence of the witnesses, the burden of proof was upon appellant to show that the transaction was freely and voluntarily entered into by decedent and that it was without undue influence exercised upon him, and free from any other vitiating facts or circumstances.

It has often been held by this court that where a grantor is old and physically infirm and is in the custody of the grantee, the burden is on the latter to show that a questioned conveyance was freely and voluntarily made with the full understanding of its consequences and nature. Gillock v. Williams et al., 199 Ky. 169, 250 S. W. 836; Jacobs' Ex'r v. Meyers, 185 Ky. 594, 215 S. W. 532; Gregg v. Hedges' Guardian et al., 227 Ky. 268, 12 S. W. (2d) 854. Many other authorities of a like nature might be cited, but the rule is too well known to the legal profession to require extensive citation of authority or further elaboration.

The argument of appellant that the evidence is insufficient to sustain the judgment is based upon the fact that the only medical or expert testimony offered on the question of decedent's mental condition was favorable to appellant, and that the testimony for appellees on that question consisted of lay or nonexpert witnesses and that the opinion of such witnesses has no probative value. While such evidence might not be of the highest probative character, yet, it is competent when based upon facts sufficient to support the opinion, or from which such opinion may be deducible.

In Bodine et al. v. Bodine, 241 Ky. 706, 44 S. W. (2d) 840, 841, the rule is thus stated in the head notes in that opinion:

"Neighbors' and friends' nonexpert testimony as to mental capacity of testator, and their opinions thereof, are admissible, where witnesses were well

acquainted with testator and had opportunity to observe him and form opinion.

"Nonexpert witnesses' opinions regarding testator's mental incapacity, unless supported by tangible facts testified to, are insufficient to take issue to jury."

See also Murphy's Ex'r v. Murphy, 146 Ky. 396, 142 S. W. 1018, 1019, wherein it is said:

"It is true some of the evidence as to want of testamentary capacity consisted of mere expressions of opinion on the part of nonexperts as to the testator's incompetency, but nonexpert witnesses, claiming to know, and having an opportunity to observe the conduct of a testator, may give their opinions as to his mental capacity; the question of the weight and value of such opinions being for the jury.

"As said in Newcomb's Ex'r v. Newcomb, 96 Ky. 120, 27 S. W. 997, 16 Ky. Law Rep. 376:

" 'The opinion of a nonexpert is competent evidence as to the capacity of the testator to make a will, where he had an opportunity to form an opinion, and he need not be able to detail the specific facts on which his opinion is based.' Wise v. Foote, 81 Ky. 10."

In the present case we find certain statements of the witnesses that perhaps are incompetent but we have not given such incompetent evidence any consideration, nor do we presume that the chancellor gave it any consideration, since there is sufficient competent evidence on the same issue. We have also observed that decedent's daughters, who are interested in the estate, testified to statements and conversations with, and acts of, decedent which ordinarily are prohibited under the provisions of Section 606 of the Civil Code of Practice. Some of this evidence was objected to and so much thereof cannot be considered; other parts of it were not objected to and in those instances the incompetency of the evidence was waived. And, as we have already stated, a considerable amount of evidence of the same character was brought out on cross-examination by counsel for appellant.

For the reasons stated we are unable to conclude that the judgment of the chancellor is contrary to the preponderance of the evidence.

Judgment affirmed.